523 P.2d 74
**The STATE of Arizona, Appellee,**
v.
**Gene Vincent DECELLO, Appellant.**
No. 2892.

Supreme Court of Arizona,
In Banc.
June 3, 1974.

Rehearing Denied June 26, 1974.
Motion Granted Sept. 17, 1974.

Gary K. Nelson, Atty. Gen., by Cleon M. Duke, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by H. Allen Gerhardt, Jr., Deputy Public Defender, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a judgment of the court following a trial without a jury finding the defendant guilty of first degree murder, §§ 13–451, –452, –453 A.R.S., and a sentence thereon of life imprisonment.

We are asked to answer the following questions on appeal:

1. Was the defendant competent to waive his right to trial by jury?

2. If competent, does the record reflect that he did in fact waive his right to trial by jury?

3. Does the evidence support a conviction for first degree murder?

The facts necessary for a determination of the matter on appeal are as follows. On the norning of 12 May 1973, the body of John Sutter was found by his landlord in the room that he rented. The body contained numerous stab wounds. Both before and after the discovery of the body, defendant stated to several witnesses that he had killed the deceased. Jeanie Johnston, for example, testified:

"Q And what did he say at that time?

"A Well, he said that he thought he had killed a man and I said I didn't, you know, know whether to believe him or what because you hear so many things in a bar.

And I said, 'Are you sure you killed him.'

And he said, 'I stabbed him eight times in the heart,' or 14—eight or 14, something like that in the heart, and he said, 'Yes, he's dead'."

And Esther McCluer testified:

"A Yes. He ordered a drink and then he called me over to the side and he said, 'I have got to tell you something.' And he said, 'I don't want you to tell anybody.' He said, 'I am in trouble.'

And these might not be the exact words, but it is what he related to me, and he said, 'I killed a man.' And I said, 'Gene, you are joking.' He said, 'No, I really did.' I said, 'What did you do?'

He said, 'I cut his throat,' and I says—I really didn't believe it, and I says, 'If you did, how do you know he's dead? You ought to call an ambulance or something.' And he says, 'No, I know he's dead because I went back over there and he was laying on the floor and I picked him up and put him in the bed and covered him up'."

When arrested the defendant was in possession of the deceased's automobile. The defendant testified, as did his wife, that they had borrowed the deceased's car before and that the deceased had loaned the car to him this time. Defendant also testified that he had found John Sutter's body early in the morning of 12 May on the floor of the rented room and that he later put the body on the bed. He stated he did not call the police because of fear and shock and because he had the deceased's automobile which he felt would make him a prime murder suspect.

From a trial to the court without a jury and a verdict of guilty and sentence of life imprisonment, the defendant appeals.

WAS THE DEFENDANT COMPETENT TO WAIVE THE JURY?

In Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), the United States Supreme Court, in reversing the decision of this court in State v. Westbrook, 99 Ariz. 30, 406 P.2d 388 (1965), held that even though the court has properly found that the defendant was competent to stand trial, the court must also find further that the defendant was competent to waive his right to an attorney. The United States Supreme Court stated:

"* * * Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. 'The constitutional right of an

accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.' * * *" Westbrook v. Arizona, supra, 384 U.S. at 150, 86 S.Ct. at 1320, 16 L.Ed.2d at 430.

The matter of defendant's competency in the instant case was presented to the trial court upon the written reports of two psychiatrists who had examined the defendant, and a written report of the Arizona State Hospital where defendant was held for observation. The report of Dr. Otto Bendheim concluded:

"1. The defendant presently does not suffer from a mental illness or defect with the possible exception of alcoholism.

"2. The defendant is able to understand the nature of the proceedings against him.

"3. The defendant is able to assist in his own defense.

"4. The defendant does not suffer from a condition which is diagnosed solely as a sociopathic or psychopathic personality disorder.

"5. The defendant's ability to reason or to control his conduct is not substantially impaired.

"6. At the time of my examination I found no evidence of a potential for violent or dangerous behavior.

"7. The defendant's present mental condition does not justify commitment to a mental institution."

And Dr. Paul Bindelglas stated:

"We are dealing with a man who is a heavy drinker, but nevertheless was able to work fairly regularly and make an adequate living. He is exceedingly suspicious, does not have any friends, but nevertheless has not had hallucinations or delusions or true paranoid ideation.

Although he might not be totally trusting of his attorney, he should be able to cooperate in his own defense and to assist his attorney in this defense. He is certainly capable of understanding the nature of the proceedings against him. Mr. DeCello is not suffering from a condition which is solely sociopathic or psychopathic personality disorder. At this point in time the defendant's ability to reason or to control his conduct is fairly adequate."

The report of the Arizona State Hospital read:

"* * * The patient has the ability to think clearly and logically. Mr. Decello is able to understand the charges against him and to assist in his own defense."

The minute entries recite:

"Hearing on medical reports as submitted by the Arizona State Hospital. Richard Mesh and George Mount are present for the State; defendant is present with counsel, Sheldon Stern; court reporter Beti Schwartz is also present.

"Counsel have indicated to the court that the matter may be submitted to the court based on the medical reports prepared and submitted by the medical experts.

"Pursuant to stipulation of counsel, the defendant having waived his right to trial by jury,

"IT IS ORDERED setting this cause for trial to the court on 23 October 1973 at 9:30 A.M., division 20–C.

"After an evaluation of the medical reports, the court finds that the defendant is able to stand trial; understands the nature of the proceedings against him, and is able to cooperate with this counsel."

▪ A defendant who waives the assistance of counsel in a criminal trial is by that very act doing something that calls into question his rationality, and the United States Supreme Court has indicated that greater care must be taken in allowing a person to waive his right to an attorney

than it does in finding him competent to stand trial. Westbrook, supra. We do not believe, however, that the United States Supreme Court in Westbrook, supra, mandates that a defendant who is represented by counsel and is competent to stand trial must be given, absent other facts, a further hearing by the court as to his competency to waive his right to a jury.

The right to a jury trial is admittedly a precious constitutional right, but its waiver is more often than not a question of trial strategy in which the subjective evaluations of the attorney for the defendant play a more important role than the discretion of the defendant. Unlike the waiver of assistance of counsel or plea of guilty, the waiver of a jury may well be in the defendant's best interests.

The United States Court of Appeals for the Ninth Circuit has indicated, however, that waiver of the right to jury stands on the same level as a waiver of assistance of counsel as far as competency of the defendant to waive is concerned:

"  *  *  *  In the typical case—that is, when the defendant's sanity or mental capacity has not been put in issue—the determination of the validity of the waiver by the defendant can be assessed with an assumption that he is mentally capable of making the weighty decisions involved in giving up his right to counsel, cross-examination, trial by jury, or his privilege against self-incrimination. However, where a substantial question of a defendant's mental capacity has arisen in a criminal proceedings, it is logically inconsistent to suggest that his waiver can be examined by mere reference to those criteria we examine in cases where the defendant is presumed competent, since in the latter cases no inquiry into the defendant's mental capacity to make the waiver is made. (citations omitted) If a defendant who can be presumed competent pleads guilty, a court can assess the adequacy of his waiver by examination of the objective evidence in the record, such as the advice given him by the court as to the nature of the charge, the waivers resulting from the plea and the sentencing prospects, as well as the defendant's statements or responses made in open court. Where the question of a defendant's lack of mental capacity lurks in the background, however, the same inquiry, while still necessary, fails to completely resolve the question of whether the defendant can properly be said to have had a 'rational, as well as a factual, understanding' * * *.

"We think *Westbrook* makes it plain that, where a defendant's competency has been put in issue, the trial court must look further than to the usual 'objective' criteria in determining the adequacy of a constitutional waiver. * * *" Sieling v. Eyman, 478 F.2d 211, 214 (9th Cir. 1973).

We believe that the facts in the Sieling case may be distinguished from the facts in the instant case. In Sieling, supra, there was a definite conflict in the psychiatrists' testimony which not only put the defendant's sanity "in issue," but raised a "substantial question" as to his mental capacity. In the instant case, even though psychiatrists were appointed and the defendant was sent to the hospital for evaluation, the reports were in agreement as to defendant's mental capacity. Admittedly, the trial court did not specifically direct its findings to defendant's specific competency to waive his constitutional right to a jury. We believe, however, that the record before us is able to support such a finding on appeal and we so find.

We find no error.

### DID THE DEFENDANT IN FACT WAIVE THE JURY?

Defendant contends further that even if he was competent to waive the jury, the record does not reflect such a waiver. We agree. The record before this court is void of such fact, and this

matter will have to be remanded to the trial court for a finding to determine whether or not the defendant did, in fact, waive his right to a jury.

## WAS THERE SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR FIRST DEGREE MURDER?

The defendant contends that there is no showing that the stab wounds did, in fact, cause the death of the deceased. The pathologist testified:

"Q And would you tell the Court what that examination consisted of?

"A I conducted a complete internal and external examination of the body.

"Q And what did your external examination reveal?

"A The body was that of an elderly man that was 69 inches in length and weighed 128 pounds.

There were a number of wounds on the external surface of the body. The first one that I described is on the base of the neck, consisted of a stab wound two inches in length and superimposed on it was a superficial laceration six inches in length extending from the base of the neck around to the lateral side.

Then the front of the chest, there were three closely grouped stab wounds, each about one-half inch in length, and these were located from 53 to 54 inches above the heel and from one to two inches left of the midline.

There was a small laceration at the base of the left little finger and there were six stab wounds in the back of the right chest, one of them in the midline and the others ranging up to as much as four inches to the right of the midline, and all of them 54 to 58 inches above the heel. There was a small scratch over the right collarbone and a superficial abrasion of the right knee.

"Q Would you tell the Court what your internal examination then revealed?

"A In examining the chest, it developed that there were two penetrating stab wounds of the right lung, these entering the back, and these were the only two of the six stab wounds in the back that did enter the chest. In the front there were three closely grouped stab wounds of the heart on the front surface that extended into the left ventricle of the heart and as a result of these wounds of both the heart and the lung there was extensive bleeding around the heart and pericardium and in the right thoracic space.

The remainder of the examination disclosed also a far-advanced cancer of the left lung, which was not involved in any of the stab wounds.

"Q Anything else that was revealed of significance?

"A No, sir, nothing else of significance.

\* \* \* \* \* \*

"Q Was there any way, Doctor, of determining which of the stab wounds were inflicted first?

"A No.

"Q Would there have been a considerable amount of bleeding caused by the stab wounds?

"A Yes, sir.

"Q Both front and back?

"A The wound that would have bled most is the two-inch laceration at the base of the neck. The other wounds would have bled to a lesser extent but probably significantly."

The pathologist did not testify directly that the stab wounds caused the death.

■ Circumstances surrounding a death may be sufficient to support a finding of the cause of a death without expert opinion as to the cause:

"The fact that the victim died from the combined effects of a pre-existing dis-

ease or condition and a blow or wound maliciously inflicted by the defendant does not relieve the defendant of liability. (footnote omitted)  When a person inflicts a blow or wound upon another

[i]t is well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed, at the time the act was done, or by his low vitality, which rendered him unable to withstand the shock of the wound inflicted, and without which pre-existing condition the blow would not have been fatal, if a causal connection between the blow and the fact of death is made to appear.  Accordingly, the fact that the victim died from the combined effects of the wound maliciously inflicted by the defendant and a disease not connected with the wound does not relieve the defendant of liability.  (footnote omitted)

"Expert testimony is not necessarily essential to support a conviction of homicide.  Thus, where it is apparent that ordinary laymen could perceive, from such factors as the nature of the wound or the circumstances surrounding an attack, that a defendant's acts caused the death, medical testimony as to cause of death is not essential.  (footnote omitted)  A contrary result is reached, however, where from the nature of the agency alleged to have caused the death, the causal connection is not within the average layman's perception.  In such circumstances, expert testimony is essential to support a conviction.  (footnote omitted)"  Armstrong v. State (Alaska), 502 P.2d 440, 445–446 (1972).

Despite the advanced state of the cancer of the lung, we have no difficulty in finding that the testimony presented was sufficient from which the trial court could find that the stab wounds were, in fact, the cause of the death.  The evidence was suf-

ficient to link the defendant to said stab wounds and support a conviction for first degree murder.  State v. Drury, 110 Ariz. 447, 520 P.2d 495 (1974).

The matter is remanded to the trial court for a hearing to determine if the defendant did, in fact, waive the right to a jury trial.  The court shall make findings of fact and certify to this court said findings together with the reporter's transcript of any hearing held thereon within thirty days of the date of the issuance of the mandate in this case.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.

On Motion Granted

Ordered: Motion to Set Aside Conviction—Granted.

Further ordered: Remanding this cause for a new trial.