Mary Johnson Lowe, J.
In this season of rebirth and reaffirmation of life, this court (Supreme Court, Criminal Branch, Part XII) is called upon to assume the ironic task of determining what is the legal definition of death or, more precisely, when death occurs.
Article 43 of the Public Health Law generally known as the Uniform Anatomical Gifts Statute, is this State’s affirmation of our public policy of encouraging anatomical gifts by a donor or a donor’s next of kin of organs for transplantation so that others might live as a result of the charity of those who have died.
The New York City Health and Hospitals Corporation, petitioner herein, brings this action for a declaratory judgment to define legally the time of death as used in sections 4301 and 4306 of the Public Health Law because of its alleged inability to effectuate the intent of article 43 with the result that needless deaths of potential recipients have occurred.
Article 43 does not define "death” or "the time of death” and there presently exists a discrepancy between the common-law criteria for determining death which are the easily observable absence of heartbeat and respiration (Black’s Law Dictionary [4th ed], p 488) and the medically recognized concept of "brain death” as defined by criteria formulated by the Harvard Medical School’s Ad Hoc Committee to Examine the Definition of Brain Death (Report of the Ad Hoc Committee of the Harvard Medical School, JAMA 205:337-340, 1968; also see, Refinements in Criteria for the Determination of Death: An Appraisal, JAMA 221:48-53, 1972).
In the common-law era, prior to modern anatomical trans- . plantation, this distinction would have been largely academic, even if it were then noted; but medical science has now advanced to the point of perfecting mechanical means to support circulatory and respiratory functions and is, in fact, capable of substituting artificial mechanisms for the natural ones.
The case and controversy herein arises as a result of these scientific developments and because the common-law definition of death is not in accordance with the uniformly accepted *1004 medical practice of today causing physicians seeking to implement the intent of the Uniform Anatomical Gifts Statute to employ the 200-year-old definition of death rather than the generally accepted medical standard due to fear of potential criminal or civil liability.
This controversy arose dramatically on March 4, 1975, when Richard Smith, aged 27, was transferred from Lincoln Hospital and admitted to the Neurological Service at Bronx Municipal Hospital Center in a comatose condition, suffering from a gunshot wound to the left temporal area of the brain. The patient was found to be totally unresponsive with no spontaneous respiration or movement. The patient was placed on mechanical respiratory support systems to assist him during intensive treatment. Tests were conducted in accordance with generally accepted medical standards and it was determined that the patient was neurologically dead on March 5, 1975. The parents of the patient authorized the physicians to remove both kidneys and eyes for transplant purposes. That although this patient was a suitable donor and appropriate consents had been obtained from next of kin, the hospital did not proceed to effect removal of organs because of potential legal problems associated with the legal definition of death and further by policy of the Chief Medical Examiner prohibiting removal of organs from homicide victims. On March 6 the patient, in addition to neurological death, suffered cardiovascular failure and was pronounced dead. The organs were not removed, even after cardiovascular failure, because of the aforesaid prohibition and as a result two patients were then deprived of kidneys.
Two patients awaiting kidney transplants had been identified and were prepared to undergo transplant surgery at Montefiore Hospital and Medical Center. There were 23 such patients whose genetic and immunological tests were found to be compatible recipients of Mr. Smith’s kidneys.
On March 5, 1975 at 9:47 p.m. patient Daniel Sulsona, aged 21 years, was admitted to the Neurological Service at Bronx Municipal Hospital Center in a comatose condition suffering from a gunshot wound to the right parietal region of the brain. The patient was totally unresponsive, with no spontaneous respiration or movements. The patient was placed on mechanical respiratory support systems to assist him during intensive treatment. Tests were conducted in accordance with generally accepted medical standards, and it was determined *1005 that the patient was neurologieally dead on March 6, 1975. Mrs. Maria Sulsona, mother of the patient, authorized the removal of the patient’s kidneys for transplant purposes. Given the almost identical fact pattern in the Sulsona case with that of patient Smith, petitioner commenced the instant action by order to show cause returnable on Friday, March 7, 1975 at 2 p.m. to permit the petitioner to declare patient Sulsona dead and to authorize the removal of the kidneys for transplantation.
On March 7, at 6:40 a.m. patient Sulsona, in addition to neurological death, suffered cardiovascular failure and was pronounced dead. The physicians, on the advice of counsel, proceeded to remove the kidneys of patient Sulsona and thereafter successfully transplanted them into two recipients who were matched for genetic and immunological compatibility.
The Smith and Sulsona cases typify circumstances which occur virtually on a daily basis in the municipal hospitals and which, therefore, lend even greater urgency for judicial resolution of these issues.
In support of the petition herein, the court has heard District Attorney Mario Merola, District Attorney of Bronx County; Dr. Jack Fein, Assistant Professor, Neurological Surgery at the Albert Einstein College of Medicine; Dr. Julius Korein, Professor of Neurology at New York University Medical Center and Chief of Electroencephalography at Bellevue Medical Center; Dr. Samuel L. Kountz, Professor and Chairman of the Department of Surgery, State University of New York, Downstate Medical Center in Brooklyn and the recognized authority in the field of transplant surgery; Dr. Frank J. Veith, Professor of Surgery at Albert Einstein College of Medicine, Co-Director of the Transplant Unit at Montefiore Hospital and Chairman of the Transplant Advisory Committee for the New York-New Jersey Regional Transplant Program and Dr. Louis N. Baker, Director of the New York-New Jersey Regional Transplant Program.
Each of these doctors was accepted by all parties as the medically recognized experts in their fields and there was unanimous agreement among the doctors that the kidneys obtained from donors whose death was diagnosed on the common-law criteria of cardiac and respiratory failure have an 88% incidence of postoperative renal failure; while those kidneys resulting from "brain death” criteria are indistin *1006 guishable from kidneys obtained from living donors and therefore have the optimal chance of successful transplantation, or between 10% and 20% incidence of postoperative renal failure.
Dr. Kountz testified that in the New York-New Jersey region there are about 800 to 1,000 patients per year who suffer renal failure and that the number of patients in this region in end-stage renal disease approximate a public health crisis.
Dr. Kountz further testified that the absence of a clear, legal definition of death has a chilling effect upon transplant surgery in that it causes undue emotional distress on the part of the next of kin who wish to donate organs of the deceased. Hospital administrators do not know how to proceed in implementing the Uniform Anatomical Gifts Act and physicians are reluctant to expose themselves to possible criminal or civil liability.
Assistant Attorney-General David H. Berman, in argument, stated it was the duty of the court to construe the statute as constitutional, if there was any reasonable interpretation of the statutory term "death.” He further stated that the courts have traditionally construed legislative intent.
Mr. Bernikow, representing Medical Examiner Di Maio stated that the Medical Examiner takes no position in that part of this proceeding dealing with definition of death but was solely concerned with the postmortem duties legally imposed upon his office.
After hearing all of the evidence and arguments of all parties herein, and due deliberation being had thereon, it is the finding of this court:
That because of the urgent nature of the medical problem giving rise to the petition herein, and
That because of the unsettled state of the law in defining the duties and responsibilities of the medical community in effectuating the legislative intent as embodied in the Uniform Anatomical Gifts Statute of the State of New York (Public Health Law, art 43), and
That because all parties hereto have accepted the testimony of the medical experts offered by the petitioner that in the field of transplant surgery there is a uniformly accepted medical standard of death, and
That there is no question of fact involved but only a ques *1007 tion of law in the construction of the legislative intent in using the word "death” in article 43 of the Public Health Law.
Therefore, this court finds that the petitioner has set forth a cause of action for a declaratory judgment as to the legislative intent in the word "death” as used in sections 4301 and 4306 of the New York State Public Health Law, and
It is further found that,
In enacting section 43 of the Public Health Law, the Legislature of the State of New York intended to devise a systematic procedure to effectuate the public policy of this State to encourage Anatomical Gifts;
That said statute was drawn with the clear legislative understanding that it would be effectuated by duly licensed medical doctors acting in accordance with generally accepted medical standards;
That the context in which the term "death” is used in sections 4301 and 4306 of article 43 of the Public Health Law implies a definition consistent with the generally accepted medical practice of doctors primarily concerned with effectuating the purposes, of this statute.
This court finds further, that, in accordance with its suggestion, the medical examiner, District Attorneys of Bronx, New York and Kings Counties and representatives of the Health and Hospitals Corporation have resolved the forensic problems confronting the Medical Examiner’s office in transplant cases pursuant to section 4300 of the Public Health Law. The resulting memorandum of policy is attached hereto and incorporated herein (see memorandum of understanding) with the court’s approval and expression of gratitude to all parties to this action who have used their good offices to serve the public welfare of the people of this community.
Lastly, this court wishes to urge the New York State Legislature to take affirmative action to provide a State-wide remedy for this problem.
APPENDIX
POLICY REGARDING ORGAN TRANSPLANTS IN ALL CASES WHICH FALL UNDER THE JURISDICTION OF THE OFFICE OF CHIEF MEDICAL EXAMINER
This statement sets forth the policy of the Medical Examiner with respect to requests for organ transplants in cases *1008 falling under his jurisdiction. This statement of policy is adopted in view of the existing law and is subject to change in the event of any pertinent change in law affecting this subject.
In all cases in which physicians desire to perform organ transplants, the following procedure should be followed:
1. The attached Medical Examiner’s notification form for transplant donor shall be filled out in its entirety by one of two physicians certifying to the death of the donor and having no connection with the proposed transplant, both of whom shall certify every entry on the form.
2 '. One of the physicians certifying to the death who is fully familiar with the facts and circumstances of the case, shall notify, by telephone, the Medical Examiner’s Office of the certification of death and of the request for permission to perform organ(s) transplants. Such Doctor shall advise the Medical Examiner of all the information set forth on the form which the Medical Examiner shall require.
3. After organ(s) are removed for transplantation purposes, the member hospital and its physicians shall furnish the following data and materials to the Chief Medical Examiner:
(a) A copy of the donor’s medical record;
(b) A copy of the consent form or testamentary document authorizing removal of organ(s) for transplantation purposes;
(c) The microscopic preparation (slides from organ biopsy); and
(d) The Medical Examiner’s Notification Form for Transplant donors, which is to be filled out in its entirety.
The above data and materials shall accompany the body of the donor.
It shall be the policy of the Medical Examiner in all such cases to permit the removal of the organ(s) for transplant purposes, unless under the circumstances, the Medical Examiner shall determine for good cause that the removal of the organ(s) shall impair the ability of the Medical Examiner to perform his duties under Law and to establish the cause of death in any Court proceeding.
I am confident that the§e policy guidelines will facilitate transplantation of organs while at the same time insuring that the Office of Chief Medical Examiner can continue to fulfill its statutory duties and responsibilities.
*1009 Dominick J. DiMaio, M.D.
Chief Medical Examiner
City of New York
MEDICAL EXAMINER’S NOTIFICATION FORM FOR TRANSPLANT DONOR
1. Hospital_!_
2. Patient’s Age_ Sex_
3. Patient’s Name_
4. Circumstances Surrounding Patient’s Admission, Whether Illness, Injury, Foul Play, Homicide, etc. (Note: Circumstances of the Injury, such as Type, Time, Location, Witnesses, Etc., should be set forth if available).
5. Hospital Course Including Evidence of Cessation of Cardiac Function or Brain Death (Tests Performed, Neurological Evaluation, Neurosurgical Evaluation, EEC Findings, Cerebral Angiography, etc.)
6. Permission Granted By_
Relationship to Donor_
(note: a copy of the consent form is to be simultaneously SUBMITTED WITH THIS FORM)
7. Complete Chart with Operative Findings of organ(s) Transplant Donor and organ(s) Biopsy.
Organ biopsy must be taken from the organ(s) removed. Reports and slides must be given to the Medical Examiner in order that he may incorporate the same in his autopsy protocol and thereby establish a permanent record to be maintained in the Office of the Chief Medical Examiner. Once organ biopsies have been taken, the Medical Examiner’s presence will not be required in the operating room. However, the Surgeon must forward a surgical report of his operative technique with the complete description of the organ(s) removed, since they will be made a part of protocol.
*1010 8. Name of Medical Examiner Contacted by Telephone
9. Time of Death of Donor_Date_
The undersigned Attending Physicians do hereby certify the fact of the decedent’s death; and do further certify to the truth of all the entries set forth in this Medical Examiner’s Notification Form.
_M.D.
Attending Physician
_M.D.
(note: the time of death shall be certified by the attending PHYSICIAN AND ONE OTHER PHYSICIAN. NEITHER PHYSICIAN SHALL PARTICIPATE IN THE PROCEDURE FOR REMOVING OR TRANSPLANTING THE ORGAN. PENDING CLARIFICATION OF THE LAW CONCERNING DEFINITION OF DEATH, AUTHORIZATION TO REMOVE ORGANS FROM VICTIMS OF HOMICIDES WILL ONLY BE GRANTED FOLLOWING CERTIFICATION BY PHYSICIANS OF CESSATION OF SPONTANEOUS HEART FUNCTION.)