603 P.2d 74

**The STATE of Arizona, Appellee,**

v.

**David Madrid FIERRO, Appellant.**

No. 4271.

Supreme Court of Arizona,
In Banc.

Oct. 22, 1979.

John A. LaSota, Jr., former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Linzer, Lebowitz & Frondorf by Shirley H. Frondorf, Phoenix, for appellant.

CAMERON, Chief Justice.

Defendant David Madrid Fierro was adjudged guilty of first degree murder, A.R.S. § 13–452,* following trial to a jury in the Maricopa County Superior Court and was sentenced to life imprisonment. We have jurisdiction of this appeal pursuant to A.R.S. § 13–1711.

We must answer the following questions on appeal:

1. Was the evidence sufficient to support the jury's conclusion that the defendant caused the death of the victim?

---

* Citations to the criminal code refer to the sections as they were numbered at the time of the crime and prior to the criminal code effective 1 October 1978.

2. Was it error for the trial court to have allowed testimony from two attorneys who had previously represented the defendant?

3. Did the trial court properly admit expert testimony on the subject of the Mexican Mafia?

4. Was defense counsel improperly restricted in presenting evidence?

The facts necessary for a resolution of this matter on appeal are as follows. Between 8 and 9 o'clock on the evening of 18 August 1977, Victor Corella was given a ride by Ray Montez and his wife Sandra as they were attempting to locate some marijuana. In the vicinity of 12th Street and Pima, Ray Montez heard his name called from another car. He stopped his car, walked over to the other car and saw that the passenger who had called his name was the defendant David Fierro. Defendant told Ray Montez that his brother in the "M," or "Mexican Mafia," had instructed the defendant to kill Corella. Ray Montez told defendant to do it outside the car because he and his wife "did not want to see anything."

Montez returned to his car. Defendant followed and began talking with Corella. Corella got out of the car. Montez started to drive away when defendant began shooting Corella. Corella was shot once in the chest and four times in the head. Following the shooting, Corella's body was taken to the emergency room at Maricopa County Hospital. His blood pressure was very low due to secondary bleeding from the gunshot wound to the chest area. Surgery was performed in an effort to control the bleeding. He was then taken to the surgical intensive care unit where a follow-up examination and evaluation revealed that he had suffered brain death. Corella was maintained on support systems for the next three days while follow-up studies were completed which confirmed the occurrence of brain death. The supportive measures were terminated and he was pronounced dead on 22 August 1977.

Ray Montez, upon reading the day after the shooting that Corella was still alive, reported to his probation officer the details of the shooting. Ray Montez and his wife Sandra were the principal witnesses against the defendant.

## CAUSE OF DEATH

At the trial, Dr. Hugh McGill, a surgical resident at the Maricopa County Hospital, testified that:

"A   After surgery he was taken to the intensive care unit. He was evaluated by a neurosurgeon who felt there was nothing we could do for his brain, he had brain death. He remained somewhat stable over the next two or three days. We had followup studies that confirmed our impression of brain death and because of that supportive measures were terminated and he was pronounced dead, I believe, on the 22nd.

"Q   Who pronounced him dead?

"A   I did.

"Q   Approximately what time?

"A   3:45 p. m. on the 22nd of August.

"Q   How many days after he was brought in did you actually pronounce him dead?

"A   Would have been four days."

Dr. Hugh McGill, who performed the surgery on Corella and later pronounced him dead, and Doctor Thomas B. Jarvis, a Deputy Medical Examiner who performed an autopsy on Corella, both testified the cause of death was multiple gunshot wounds to the head.

█   Defendant initially argues that the termination of support systems by attendant doctors three days after Corella had suffered "brain death" was the cause of Corella's death, and that the evidence supporting the judgment of guilt to the crime of murder was therefore insufficient to convict the defendant Fierro. We do not agree:

"*   *   *   it is not indispensible to a conviction that the wounds be fatal and the direct cause of death. It is sufficient that they cause death indirectly through

a chain of natural effects and causes unchanged by human action. * * * " *Drury v. Burr*, 107 Ariz. 124, 126, 483 P.2d 539, 541 (1971). See also, *State v. Decello*, 111 Ariz. 46, 523 P.2d 74 (1974).

By the phrase "unchanged by human action" in *Drury*, we meant human action that changes or breaks the chain of natural events and of itself causes the death of the victim. In the instant case, the removal of life support systems did not change nor alter the natural progression of the victim's physical condition from the gunshot wounds in the head to his resulting death. There was no change "by human action."

"One who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility, provided such other causes are not the proximate cause of the death." *State v. Cheatham*, 340 S.W.2d 16, 20 (Mo.1960), quoting 26 Am.Jur., § 48 at 191.

The removal of the life support systems was not the proximate cause of death, the gunshot wounds were, and it was not error to find that the defendant was the cause of the victim's death.

We also believe that the defendant was legally dead before the life support systems were withdrawn. Although our legislature has defined dead human remains in A.R.S. § 36–301(1) and fetal death in A.R.S. § 36–301(2), it has not adopted a definition of death. A statutory definition is not necessary, however. Both the fact of death and its cause can be apparent to an ordinary layman when the condition of the body or the nature of the wound is such that no other determination is reasonable. When these obvious factors are present, it is not necessary that experts be required to testify in order to establish death and its cause. It is only where the fact of death and its cause is beyond the understanding of the average layman that expert testimony may be necessary.

The common law definition of death was as follows:

"The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." Black's Law Dictionary 488 (4th ed. 1968).

Thus, according to common law, as long as the person was breathing and the blood was flowing through his veins he was not dead even though his brain was no longer able to function.

Because of the increased interest in organ transplants, it was felt by some that a new definition of death was necessary. As a result, the National Conference of Commissioners on Uniform State Laws proposed the Uniform Brain Death Act that stated, "for legal and medical purposes an individual who has sustained irreversible cessation of all functioning of the brain including the brain stem, is dead." The uniform law provides that a determination of brain death must be made "in accordance with the reasonable medical standards." The Report of the Ad Hoc Committee of the Harvard Medical School at 205 Journal of American Medical Association 337 (1968) defined "cessation of life" as "brain death" which takes place when there is (1) unresponsiveness to normally painful stimuli; (2) absence of spontaneous movements or breathing; and (3) absence of reflexes.

In the instant case, the body of the victim was breathing, though not spontaneously, and blood was pulsating through his body before the life support mechanisms were withdrawn. Because there was an absence of cardiac and circulatory arrest, under the common law rule he would not have been legally dead. Under the Harvard Medical School test and Proposal of the National Conference of Commissioners on Uniform State Laws he was, in fact, dead before the life supports were withdrawn as he had become "brain" or "neurologically" dead prior to that time. We believe that while the common law definition of death is still sufficient to establish death,

the test of the Harvard Medical School or the Commissioners on Uniform State Laws, if properly supported by expert medical testimony, is also a valid test for death in Arizona. See *New York City Health and Hospitals Corporation v. Sulsona*, 81 Misc.2d 1002, 367 N.Y.S.2d 686, 76 A.L.R.3d 905 (1975); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 79 A.L.R.3d 205 (1967); Capron & Kass, "A Statutory Definition for the Standards for Determining Human Death and a Proposal," 121 U.Pa.L.Rev. 87 (1972); Biorck, "When is Death?" 1968 Wis.L.Rev. 484. In the instant case, expert testimony was received which showed that the victim has suffered irreversible "brain death" before the life supports had been withdrawn. In effect, the doctors were just passively stepping aside to let the natural course of events lead from brain death to common law death. In either case, the victim was legally dead for the purpose of the statute, A.R.S. § 13–452.

## TESTIMONY OF THE ATTORNEYS

■ Defendant next urges that it was prejudicial error for the trial court to have allowed the testimony of the two attorneys, both of whom had previously represented Montez, the State's key witness, as well as the defendant Fierro.

The attorneys in question had represented Ray Montez in a previous criminal trial. They were then assigned to represent the defendant in the instant case, but withdrew at the preliminary hearing when it became evident that Ray Montez was the State's witness against defendant. At trial Montez testified that he had never been given preferential treatment by the State for his willingness to be a prosecution witness. To bolster this testimony, the State then called the two attorneys to show that Montez had not been given preferential treatment in the matters in which he was represented by the two attorneys. Both attorneys objected to testifying, but were directed by the court to testify regarding the plea agreements in the cases where they had represented Montez. They were instructed by the court not to reveal to the jury that they had ever represented the defendant in a criminal case.

Defendant argues that this case is controlled by the case of *Corbin v. Broadman*, 6 Ariz.App. 436, 433 P.2d 289 (1967). In that case a prosecutor who while in previous private practice had, in fact, sat in on conferences at which matters that formed part of the later criminal action were discussed, was precluded from participating in the prosecution of his former employer and client.

In the instant case, the attorneys were not asked to testify as to any confidential matters that they might have learned by virtue of their representation of the defendant. The trial judge made it quite clear that matters of confidence could not be inquired into and that the attorneys' testimony could only reflect those matters relating to the plea agreements.

We do not believe there was any prejudice to the defendant nor any error. The attorneys were not testifying to any confidential conversations made by the defendant during the brief time the two attorneys represented him. They were testifying as to facts completely outside their brief attorney-client relationship with the defendant. We find no error.

## EXPERT TESTIMONY

■ Defendant next argues that the trial court erred in admitting expert testimony on the subject of the Mexican Mafia.

Defendant called Jesse Bojorquez as a defense witness. Bojorquez denied putting out a "hit" contract on the victim Corella. He also denied any knowledge of the "Mexican Mafia" and denied the "MM" tattoo on his arm stood for "Mexican Mafia." On rebuttal, the State called on Raymond Herand as an expert on the Mexican Mafia in particular and prison gangs in general. Herand, an attorney, had spent seven months investigating prison gangs in the Arizona State Prison. He had, in the process, interviewed members of the various gangs including members of the "Mexican Mafia," other prison inmates, guards and law enforcement officers. Based on his research,

he had prepared a 150 page report for the Arizona legislature and had conducted hearings before the legislature on the subject.

Defendant urges that the expert testimony was inadmissible because it was based upon hearsay and other sources not admissible in evidence.

Rule 703, Arizona Rules of Evidence, 17A A.R.S., states as follows:

"The facts or data in the particular case upon which an expert bases on opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be inadmissible in evidence."

While admitting that much of the specific information received by the witness would not have been admitted as hearsay, the information relied upon by the expert witness was nevertheless "of a type [that could be] reasonably relied upon by experts * * in forming opinions or inferences upon the subject * * *." Rule 703, supra. We find no abuse of discretion.

Defendant also contends that the whole subject of the Mexican Mafia was not relevant to any issues at trial. The record indicates otherwise. The subject of the Mexican Mafia is part of the "complete picture" of the crime. Montez testified that he was told by the defendant that the reason for Corella's murder was that it had been ordered by a "brother" in the Mexican Mafia. The trial judge determined that evidence regarding the existence, purpose and behavior of such a group and its members was highly probative on the issue of defendant's possible motive for murder. Rule 401, Arizona Rules of Evidence, 17A A.R.S. Expert testimony is a question within the sound discretion of the trial court and will not be altered on appeal absent a clear abuse of discretion. *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978); *State v. Means*, 115 Ariz. 502, 566 P.2d 303 (1977). We find no abuse of discretion.

## RESTRICTIONS ON EVIDENCE

■ Defendant also urges that he was prejudiced by other evidentiary rulings. Specifically, defendant contends that he was erroneously precluded from introducing evidence tending to show that the State's key witness, Ray Montez, was the subject of favorable police treatment and that he was apparently immune from incarceration in spite of the commission of previous crimes.

Specifically defendant wanted to show, by the testimony of a defense witness, Edward Valenzuela, that despite the fact that Ray Montez indicated in his testimony that he had never received any special consideration he had, in fact, been arrested in a drug raid at which weapons were confiscated and was turned loose the same day. At the trial the following transpired:

"MR. ZETTLER: What, pray tell, does this have to do with your case since I don't know anything about this either?

"THE COURT: What is the totality of this?

"MR. SOUTHERN: Your Honor, he will testify that he was in the motel shooting up with Ray Montez and his wife Sandra and he gave him some guns, sold him some guns. He will testify that when he came back by the motel later he saw the police officers there and parked his car and watched them bringing out Ray Montez and the guns and arresting him.

He will also testify that after that evening he told somebody and found out that Ray Montez was out on the street, that he couldn't believe it and that he went and saw Ray Montez that evening, and Ray Montez was out and had the guns. This shows special treatment by the police department. I think it is material.

"MR. ZETTLER: Your Honor, this is the first time I have ever heard this.

"MR. SOUTHERN: Did you ask him, Mr. Zettler?

"MR. ZETTLER: Excuse me, Mr. Southern. When I talked to him it was

one week ago in jail. I asked him, 'What do you know about Ray Montez?' I said, 'Tell me everything.' He never told me a thing about this. I want to know where this information is coming from."

Although there had been considerable testimony by the witness Valenzuela concerning Ray Montez's alleged special treatment by the police, the trial court refused to admit this specific evidence despite defense counsel's subsequent offer of proof because of defendant's failure to disclose this evidence to the prosecution prior to trial.

Rule 15.2(c) of the Arizona Rules of Criminal Procedure, 17 A.R.S., reads as follows:

"c. Disclosures by Defendant. Simultaneously with the notice of defenses submitted under Rule 15.2(b), the defendant shall make available to the prosecutor for examination and reproduction:

(1) The names and addresses of all persons, other than the defendant himself, whom he will call as witnesses at trial, together with all statements made by them in connection with the particular case;"

And Rule 15.7 reads as follows:

"Rule 15.7 Sanctions

"a. If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with any provisions of this rule or any order issued pursuant thereto, the court may impose any sanction which it finds just under the circumstances, including, but not limited to:

\* \* \* \* \* \*

"(4) Precluding a party from calling a witness, offering evidence, or raising a defense not disclosed \* \* \*."

In the recent case of *State v. Smith*, 123 Ariz. 243, 599 P.2d 199, 1979, we held that the trial court should prohibit the calling of witnesses "only in those cases where other less stringent sanctions are not applicable to effect the ends of justice." In the instant case the defendant had failed to abide by the discovery rules in numerous instances where the evidence was admitted. The trial court stated:

"\* \* \* I just do believe that bringing this up at this time with no preindications is a real violation of Rule 15.2. Up to this point I have exercised my discretion, I have bent over backwards to allow in everything, but it just went too far with this."

We find in the record neither justification for defendant's failure to abide by the discovery rule nor prejudice to his defense. Under these facts and due to the failure of the defendant to abide by the requirements for discovery contained in Rule 15.2, the trial court properly prohibited this evidence from being admitted. Rule 15.7, Arizona Rules of Criminal Procedure, 17 A.R.S. We find no abuse of discretion. *State v. Macumber*, 119 Ariz. 516, 582 P.2d 162 (1978); *State v. Smith*, supra.

■ Defendant also attempted to show, through the victim's mother, Isabel Corella, that about a month before Victor Corella's death a person knocked on her door and that later a number of shots were fired into her house. The defendant failed to show the materiality of such evidence and it was excluded by the trial court. This evidence did not bear upon any material fact in issue or cast light on the crime charged. We find no abuse of discretion. *State v. Moss*, 119 Ariz. 4, 579 P.2d 42 (1978); Rule 401, Arizona Rules of Evidence, 17A A.R.S.

The verdict and judgment of guilt are affirmed.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.