The People of the State of New York, Respondent, v Robert Bonilla, Appellant.

Second Department, September 19, 1983

APPEARANCES OF COUNSEL

*William E. Hellerstein* (*David Samel* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney* (*Michael Yoeli* of counsel), for respondent.

OPINION OF THE COURT

Rubin, J.

This appeal raises the question of whether a defendant who has inflicted a mortal wound on another person can escape a homicide conviction because of the acts of hospital doctors in removing the victim's kidneys and spleen for transplant and thereafter disconnecting life support systems. In essence, defendant's principal contention is that the People have not proven beyond a reasonable doubt that he "cause[d] the death" of the victim (Penal Law, § 125.00). Additionally, he claims that the trial court erred in not instructing the jury on the definition of death.

After considering all of the circumstances of this case, it is clear that the evidence adduced at trial was sufficient to support the jury verdict. The trial court's charge was meticulous and exhaustive and allowed for a full range of possible verdicts. Key concepts of intent and causation were presented. It was not reversible error for the trial court to have refused to define death.

The underlying physical facts constituting the crimes charged are not in dispute. Defendant was acquainted with a small-time marihuana dealer named Orlando Miranda, also known as "Little Man". The two became enemies and apparently had several arguments. Defendant felt that Miranda was deliberately harassing and embarrassing him in front of his cohorts. Finally, on the evening of February 6, 1979, defendant saw Miranda outside of the cleaning store where defendant was employed, at which time Miranda gave him "a bad look". Prior to this, defendant had been drinking and had consumed somewhere between one and one and one-half quarts of rum with three other friends. Defendant borrowed a 32-caliber pistol from a friend, and went to the area where Miranda could normally be found. He located Miranda and kept him under observation for about two hours, waiting until he was alone. He then approached Miranda and attempted to buy some marihuana from him. An argument ensued and defendant pulled out the gun and fired at least twice at Miranda. One bullet entered the right earlobe, passed through the right side of the brain, bruising but not destroying the brainstem,[1] and came to rest in the left rear portion of the brain. The other bullet appears to have entered the body through the right shoulder and exited the left chest near the breastbone.

The defendant fled the scene and shortly thereafter, at about 10:30 P.M., a police car arrived. A police officer immediately radioed for an ambulance, but when none appeared within a few minutes, he placed Miranda in his police car and rushed him to Brookdale Hospital. When the victim arrived at the hospital emergency room, he was comatose, but had some slight reaction to noxious stimuli. Within minutes his condition deteriorated. He became totally unresponsive and remained so thereafter. He was placed on a respirator and various drug therapies were

1. "The brain has three general anatomic divisions: the cerebrum, with its outer shell called the cortex; the cerebellum; and the brainstem composed of the midbrain, the pons, and the medulla oblongata * * * Traditionally, the cerebrum has been referred to as the 'higher brain' because it has primary control of consciousness, thought, memory and feeling. The brainstem has been called the 'lower brain', since it controls spontaneous, vegetative functions such as swallowing, yawning and sleep-wake cycles" (President's Comm for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Defining Death [hereinafter President's Comm Report], US Supt Docs, No. Pr 40.8; ET 3/D34, p 15). The brainstem also controls respiration.

undertaken without result. On the following day, February 7, he was totally areflexic — completely unresponsive to all stimuli. His respiration and blood pressure were artificially supported. Two electroencephalograms (EEGs)[2] were reported to be "flat".[3] Dr. Meyer Rosenberg, chief of neurosurgery at the hospital, pronounced Miranda's condition to be cerebral death. Shortly thereafter the victim's mother signed a consent and Miranda's kidneys and spleen were removed for donation.

Investigation by the police ultimately led to defendant and, in April of 1979, he was arrested. He confessed twice to the shooting, first to a detective, and then to an Assistant District Attorney, waiving his right to an attorney in both instances. He was indicted and charged with murder in the second degree and criminal possession of a weapon in the second degree.

At trial the evidence as to the actual cause of death was provided by the Brookdale Hospital report, the autopsy report and the testimony of three physicians. Dr. Rosenberg, the attending physician, and Dr. Milton Wald, the medical examiner, testified for the People and Dr. H. Richard Beresford testified for the defense. All three medical witnesses were highly qualified.

Dr. Rosenberg first saw Miranda on the morning of February 7, 1979, at around 9:00 A.M. Prior to examining him he had received a medical history. At the time of the examination Miranda was on a mechanical respirator. Dr. Rosenberg proceeded to subject him to a series of standard tests and found him to be totally areflexic, i.e., without reflex. Testimony revealed that these tests included: touching cotton to the eyeball to see if the eye closed; flashing light on the pupil to see if it would constrict; turning the head to one side to detect eye movement (doll's

---

2. Dr. Beresford, an expert witness called by defendant, defined an electroencephalogram as a "brain wave test. It's — the way the test is performed is to place electrodes on the scalp of the head. These electrodes are then attached to a machine which has a series of needles on it which contain ink. If there is electrical activity that is being generated by brain cells, the electrodes on the head will pick up this activity. It will then be transmitted down, down into the series of little pencils, basically, which print a line on a paper. So, in other words, the electrical activity in the brain is translated into a line on a recording paper, like the electrocardiogram".

3. "[A] flat or isoelectric electroencephalogram (EEG) denotes nonexistent brain activity, or brain death." (Hirsh, Brain Death: Medico-Legal Fact, or Fiction? 3 N Ky State L F 16, 19; see, also, 1c Gordy-Gray, Attorneys' Textbook of Medicine, par 29A.02.)

eye test); and pinching the side of the neck to see if the eye would dilate to the painful stimulus. Miranda was completely immobile and unresponsive to light or to any other stimulus. The doctor also tested Miranda for spontaneous respiration by disconnecting the mechanical respirator for two or three minutes. Miranda was unable to breathe without the aid of the machine and it was reconnected.

At trial, the doctor stated that he did not perform another common test known as the colonic or ice water test whereby a physician introduces ice water into the ear canal and watches for eye movement in the direction of this uncomfortable stimulus. Based on his previous experience with head injuries such as Miranda's, he considered the "constellation" of tests used sufficient. On the following day, February 8, 1979, Dr. Rosenberg went through some of the same tests once again, with identical results. By this time, he had also been notified of the results of two EEGs which confirmed his diagnosis. He accepted the oral report that they were flat though he did not personally evaluate the EEGs. After this final examination, Dr. Rosenberg pronounced Miranda "brain dead". Dr. Rosenberg testified that he had seen other gunshot wounds of the type that Miranda had received and to his knowledge no one had ever survived a wound or trauma of this nature. He attributed the direct cause of death to the gunshot wound and its secondary effect on the brain. Beginning at about 9:25 P.M., Miranda's kidneys and spleen were removed for transplant. Hospital records disclose that anesthesia was not used during the operation though the victim remained on the respirator.

Dr. Milton Wald, the medical examiner, testified that he performed the autopsy on Miranda on February 9, 1979. He detailed the locations of the bullet wounds, and noted the removal of the deceased's kidneys. He stated, repeatedly and without qualification, on both direct and cross-examination, that Miranda's death was solely attributable to the bullet wound to the skull and brain:

"Q Could you say specifically and unequivocally, doctor, that the death of Orlando Miranda was solely attributable to the gunshot wounds?

"A Yes, sir.

"Q You can say that?

"A Yes, sir.

"Q Unequivocally?

"A Yes.

"Q That's based upon your examination or is that also based upon the determination of brain death as received by you from Brookdale Hospital?

"A Without the determination of brain death. Without that.

"Q And without the transplant?

"A Without the transplant.

"Q Death was caused solely by the —

"A Gunshot wound of head and brain."

Dr. Wald described the sticky, soft texture of the victim's brain as being consistent with brain death. However, he could not specify when brain death occurred nor could he prognosticate how long Miranda would have survived in a vegetative state or otherwise were it not for other intervening factors.

Dr. H. Richard Beresford, both a physician and a lawyer, qualified as an expert witness for the defense in the field of medicine and neurology. He, of course, did not examine Miranda but he had inspected the Brookdale Hospital records and the autopsy report. He elaborated on certain tests which he felt were essential to an examiner in order for him to make a finding of brain death, and expressed the opinion that the tests that had been administered did not meet current neurologic criteria. Dr. Beresford voiced doubt as to whether Miranda was actually "brain dead" when he was so pronounced. He did not, however, testify that Miranda was alive at that time or that the surgery or removal from the respirator was the cause of death. His judgment was based on his evaluation of the hospital records which did not specify all of the diagnostic tests performed by Dr. Rosenberg. Two unlisted tests (the doll's eye test and the spontaneous respiration test), considered essential by Dr. Beresford, were actually performed.

Dr. Beresford admitted that there were varying criteria acceptable to the medical community for determination of

brain death, with no single definitive procedure required. He disagreed with the method used by Dr. Rosenberg in testing for spontaneous respiration and with his evaluation of the two EEGs. Reading from the hospital record, he noted an entry concerning the first EEG stating that it was "normal". Dr. Rosenberg had relied on an oral report that this same EEG was "flat", indicating that there was no brain activity at that particular time. The second EEG exhibited "artefacts" which are signs of electrical activity. Dr. Beresford was not clear whether these artefacts could be attributed to a source other than the brain or if in fact this EEG was indeed "flat". The doctor further stated that the EEG was a means of measuring higher level brain function, and not a test that would exclusively establish brain death.[4] He opined that measurement of brainstem function could be achieved either through the doll's eye response or the ice water test.

As indicated by the foregoing synopsis of Dr. Beresford's testimony, a primary thrust of the defense strategy was predicated on brain death. We are, therefore, constrained under these circumstances to consider this proposed definition of death. However, the critical issue in this case is "causation".

Until recent years the legal definition of death had evolved through the common law as a cardiorespiratory standard and was generally recognized as: "The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation etc." (Black's Law Dictionary [4th ed, 1968], p 488). The science of medicine has advanced to a point where traumas and illnesses which were certain to cause death a few years ago do not necessarily result in death at the present time. Of immense importance in this area has been the invention and development of so-called "life support systems". Today most hospitals have equipment which can either substitute for, or stimulate and

---

4. A serious dispute exits in the medical community concerning the effectiveness of the EEG in diagnosing lack of brain activity and the weight to be given to a "flat" EEG. (See Comment, The Criteria for Determining Death in Vital Organ Transplants — A Medico-Legal Dilemma, 38 Mo L Rev 220, 227; Hirsh, Brain Death: Medico-Legal Fact, or Fiction? 3 N Ky State L F 16.)

maintain, certain basic body functions which are necessary to sustain life. In most cases they are used until such time as corrective medical practices, such as surgery, or the natural recuperative powers of the human body itself, restore the individual to normal function. Of course, there are cases where the damage is so severe that neither artificial means nor natural recuperative powers can succeed and, as a result, basic life functions continue only so long as the artificial life support systems sustain them or, in some cases, death occurs in spite of the life support systems. These advances in medical technology sometimes blur the distinction between life and death (*Matter of Eichner [Fox]*, 73 AD2d 431, 448, mod 52 NY2d 363). This has brought about a need for an expanded definition of "death", going beyond the classical definition set forth above (see Biörck, When is Death?, 1968 Wis L Rev 484; see, also, Showalter, Determining Death: The Legal and Theological Aspects of Brain-Related Criteria, 27 Cath Lawyer 112).

The latest edition of Black's Law Dictionary (5th ed, 1979) now defines death (p 360) as follows: "The cessation of life; permanent cessations of all vital functions and signs. Numerous states have enacted statutory definitions of death which include brain-related criteria." Parenthetically, it should be stated that New York is not one of the States which has enacted such a statutory definition. Since 1975, bills have been introduced in the State Legislature to add a new section 4140-a to the Public Health Law, the latest being in February, 1983.[5] Such proposed legislation has never been voted out of committee.

The latest edition of Black's Law Dictionary also defines "brain death" as follows (p 170):

| 5. | Year | S | A |
|---|---|---|---|
| | 1975 | S 6243 | A 7860 |
| | 1976 | S 6243 | A 7860 |
| | | S 10759 | A 12248 |
| | 1977 | S 6027 | A 4488 |
| | 1978 | S 6027 | A 4488 |
| | 1979 | | A 1607 |
| | | | A 7104 |
| | 1980 | | A 9004 |
| | | | A 7104 |
| | 1982 | S 9444 | A 11660 |
| | 1983 | | A 3551 |

"Numerous states have enacted statutory definitions of death which include brain-related criteria. 'A person shall be pronounced dead if it is determined by a physician that the person has suffered a total and irreversible cessation of brain function. There shall be independent confirmation of the death by another physician,' Calif. Health & Safety Code, Section 7180 (1976).

"Characteristics of brain death consist of: (1) unreceptivity and unresponsiveness to externally applied stimuli and internal needs; (2) no spontaneous movements or breathing; (3) no reflex activity; and (4) a flat electroencephalograph reading after 24 hour period of observation. Com. v. Golston, Mass., 366 N.E.2d 744. An increasing number of states have adopted this so-called 'Harvard' definition of brain death, either by statute or court decision." Actually all three medical witnesses in the case at bar appeared to be in general agreement with this definition and differed only as to the procedures and number of tests necessary to diagnose brain death.

To date, 27 States have enacted laws defining death (see President's Comm Report, Appendix C, p 120; n 1, *supra*). The precursor was the Kansas statute, "An Act Relating to and Defining Death", passed in 1970 (Kan Stats Ann, § 77-202). This seminal statute defines death as the cessation of circulatory and respiratory function or, in the event these functions are being artificially maintained, defines death as occurring with the total and irreversible cessation of brain function (see Capron and Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal, 121 U of Pa L Rev 87, 108). Of great significance is the Uniform Determination of Death Act which has been disseminated by the July, 1981 report "Defining Death" (President's Comm Report, *op cit.,* p 119). The definition contained in that act has the support of both the American Bar Association and the American Medical Association. It states in relevant part that: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards". The simplic-

ity of this dual definition is embodied in the most recent proposal to add a section 4140-a to the New York Public Health Law (see n 5, *supra*). It recognizes that death occurs when the brain ceases to function, notwithstanding the fact that vital organs continue to be artificially sustained. If passed, a statute embodying this definition would help to alleviate the legal quandary that now exists and eliminate judicial second guessing. At present, it is conceivable that a victim such as Miranda could be pronounced brain dead in a State with a statutory definition of death while considered alive in another State simply based on the fact that his cardiorespiratory functions continue under the aegis of a machine.

Such a definition and knowledge of the time of death as defined by the Legislature is essential in those situations where organ transplants are to be performed (Note, Medical Jurisprudence — Determining the Time of Death of the Heart Transplant Donor, 51 NC L Rev 172). Success of a transplant is maximized if the organ is removed as soon after death as possible. This prevents deterioration and assures the organ's prime condition for the preservation of another life (see Organ Transplant — Test for Death of Donor, Ann., 76 ALR3d 913; *Matter of New York City Health & Hosps. Corp. v Sulsona,* 81 Misc 2d 1002). It is for this reason that artificial means are used to maintain the donor's "traditional life-signaling functions" (Ann., 76 ALR3d 913, 914) even after pronouncement of brain death, though this produces the anomalous result of a dead brain coexisting with live organs. However, prolonged sustenance of a brain-dead individual will destroy the viability of any of his organs (Note, Survey of the Legal Aspects of Organ Transplantation, 50 Chi-Kent L Rev 510).

The fact that respiration and heartbeat continue, albeit through mechanical means, creates a dilemma for the physician who is to perform organ removal surgery and then disconnect the brain-dead patient from supportive equipment. Strict adherence to the traditional definition of death could squarely place hospitals and physicians in the path of tort and criminal liability. It was to prevent this result and thereby encourage anatomical gifts that our State adopted the Uniform Anatomical Gifts Act (Public

Health Law, art 43). That act, however, does not define death or the time at which it occurs. This has had a "chilling" effect on transplant surgery. In an effort to implement the purposes of the act, the New York City Health and Hospitals Corporation petitioned the New York Supreme Court for a declaratory judgment as to the legislative intent in the use of the word "death". The court ruled that it should be construed in accordance with generally accepted medical standards which now encompass a neurologically oriented concept of death (*Matter of New York City Health & Hosps. Corp. v Sulsona, supra*).

The stringent criteria that have been promulgated to justify the diagnosis of brain death under laws of this nature were first used in 1968 by the Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death (McCabe, A Definition of Irreversible Coma, 205 J Amer Med Assn 337; see *Matter of Bowman,* 94 Wn 2d 407). They seek to evaluate both higher brain function as well as lower brainstem function and are the criteria that have been included in the Black's Law Dictionary (5th ed) definition of brain death. It should be noted that the criterion of a flat EEG is not mandatory but is considered confirmatory. There must be permanent destruction of the entire brain evidenced by reproduction of these criteria after a passage of 24 hours. If drugs and hypothermia can be ruled out as a cause of the persistent coma and the patient's status persists, brain death has occurred (Hirsh, Brain Death: Medico-Legal Fact, or Fiction? 3 N Ky State L F 16; Comment, The Criteria for Determining Death in Vital Organ Transplants — A Medico-Legal Dilemma, 38 Mo L Rev 220; Victor, Brain Death: An Overview, 1981 Med Trial Technique Q 37, 45; see *Matter of Mora,* 107 Misc 2d 290). Though this determination is not simple, and new criteria have arisen which are not universally recognized or applied (Friloux, Death, When Does It Occur?, 27 Baylor L Rev 10, 11; Compton, Telling the Time of Human Death by Statute: An Essential and Progressive Trend, 31 Wash and Lee L Rev 521, 522; 1c Gordy-Gray, Attorneys' Textbook of Medicine, pars 29A.02, 29A.10), the *sine qua non* of a determination of brain death, whatever the protocol used, appears to be careful clinical assessment by the

attending physician accompanied by the identification of the cause of the damage to the brain (President's Comm Report, *op cit.*, p 27).

Brain death as just described must be distinguished from the persistent vegetative state exhibited in the widely publicized Karen Ann Quinlan case (*Matter of Quinlan,* 137 N J Super 227, mod 70 NJ 10, cert den *sub nom. Garger v New Jersey,* 429 US 922). The issue there focused on whether life support systems could be removed even though the brain was not irreversibly and totally destroyed. In New York, a similar situation was recently addressed in the case of *Matter of Eichner* (*Fox*) (102 Misc 2d 184, mod 73 AD2d 431, mod 52 NY2d 363, *supra*). In our court, the very scholarly and all encompassing opinion by Presiding Justice MOLLEN established a set of guidelines, later modified, which enables parties with standing to remove life supports from patients who are terminally ill, in a perpetual coma, and lack cognitive brain functions associated with the higher level of brain activity. These individuals possess some primitive form of reflex activity of the brainstem. Though lacking the sapient functions of thinking, feeling, sensing, and understanding, they nonetheless can be maintained in a vegetative state independently or with the assistance of mechanical support.

The defendant herein seeks to capitalize on the enigma of death, brain death, and their "definition". Prior to the commencement of the trial, the prosecutor and defense counsel had discussions with the court concerning a legal definition of death and the record indicates that considerable research was done on the question. At that time the court initially indicated that it would give the jury a somewhat different definition of death than the classic cessation of respiration and heart function, and that it intended to instruct the jury that: "death is the irreversible cessation of all functions of the brain".

The prosecutor and defense counsel indicated agreement with that definition. The court, however, also recognized that perhaps it was being premature and chose to "hold off" on any decision as to that instruction. During the trial, the jury was told that unlike some States, New York has no legal definition of death and when it occurs. Later, at the

conclusion of testimony, Justice KOOPER properly refused defendant's request to charge a brain death definition.

This court has previously declared that postulation of brain death criteria for the determination of death "has not as yet been accepted as legally conclusive of the issue in this State" (*Matter of Eichner [Fox]*, 73 AD2d 431, 449, mod 52 NY2d 363, *supra*). While it is primarily the Legislature's prerogative to make substantive changes in the law, based on the facts *sub judice* it is unnecessary to usurp the legislative function in view of settled law in this State on criminal causation. In the absence of any statutory directive, and with the knowledge that the New York Legislature has been unable to reach a consensus on this controversial issue, we are not inclined to select from the many definitions of sister States.[6]

The issue of whether to charge a judicially formulated definition of death, absent a statutory definition, has been confronted in other jurisdictions. In *Cranmore v State* (85 Wis 2d 722), the court declined to instruct the jury on what constitutes death and when it occurs. On review, it was found not to be reversible error. Wisconsin, like New York, was awaiting a legislative determination of an acceptable definition. As in the case at bar, the possibility existed under the facts in *Cranmore* that the Harvard criteria had not been fully complied with. There, however, no expert medical witness testified for the defense addressing the issue of brain death. The appeals court said (p 774): "We do not choose to define death, nor do we believe that the trial court was required to do so. We need only determine whether the jury could reasonably be convinced from the evidence which it had a right to believe and accept as true that the defendants were responsible for the death of [the victim.]"

The Massachusetts trial court in *Commonwealth v Golston* (373 Mass 249, cert den 434 US 1039), specifically

---

**6.** Cf. *Matter of Eichner (Fox)* (73 AD2d 431, 453, mod 52 NY2d 363), where this court, while establishing criteria to be met in order to be able to disconnect life support equipment from those patients in a vegetative state, said: "We note that there are no precedents in this State which militate against a judicial resolution of this problem. There is no body of *stare decisis;* thus, the 'continuity of law' will not be disrupted. To the extent that the decisions of sister States provide guidance, no obstacle to judicial action is presented (*Matter of Quinlan,* 70 NJ 10, *supra; Superintendent of Belchertown State School v Saikewicz,* 370 NE2d 417, *supra*)."

charged a brain death definition. Significantly, the appeals court in accepting the definition said (p 257): "[I]f the issue of 'brain death' had not been submitted to the jury, the same evidence would have been considered on the issue whether the doctor's conduct in disconnecting the respirator was an independent supervening cause of death. The outcome would have been the same."

It was therefore decided that error, if any, in submitting this instruction was harmless beyond a reasonable doubt and the Judge's charge was not an ex post facto change in the law or an invasion of the Legislature's province (cf. *Henderson v Kibbe,* 431 US 145).

By judicial fiat, the Supreme Court of Colorado in *Lovato v District Ct.* (198 Col 419), adopted a brain death definition to supplement traditional medical standards. It asserted (p 432): "We do not, however, believe that in the absence of legislative action we are precluded from facing and resolving the legal issue of whether irretrievable loss of brain function can be used as a means of detecting the condition of death. Under the circumstances of this case we are not only entitled to resolve the question, but have a duty to do so. To act otherwise would be to close our eyes to the scientific and medical advances made world wide in the past two or three decades." An instruction on brain death derived from Black's Law Dictionary (5th ed) was charged in an Indiana case, *Swafford v State* (__ Ind __, __, 421 NE2d 596, 598), and no error was found. Upon review the court remarked that it too would not close its eyes to change and disregard reality. Therefore, the disposition of the case was not controlled by the traditional definition of death (see *Matter of Bowman,* 94 Wn 2d 407, *supra*).

On appeal here the defendant addresses the issue of his culpability under both the common-law and brain death definitions. If this court subscribes solely to the traditional definition whereby cessation of heartbeat and respiration are tantamount to death, then the defendant asserts that Miranda did not die until his kidneys and the respirator were removed by the independent intervening acts of the hospital physicians. If, however, death is no longer solely synonymous with these observable phenomena but also rests upon a finding of brain death, defendant alternately

asserts that the criteria were not met by the attending physician, Dr. Rosenberg. Therefore, the defendant contends that, by any definition, someone else "caused" Miranda's death.

Although in every homicide trial, by statute, it is necessary that the People prove beyond a reasonable doubt that the defendant "cause[d] the death of a person" (Penal Law, § 125.00), New York has no concomitant statutory provision to guide a court in the determination of the effect of the intervening act of a hospital staff upon the defendant's criminal liability (*People v Stewart,* 40 NY2d 692, 696; *People v Kibbe,* 35 NY2d 407, 412). The issue of whether the bullet wound to the brain was a proximate cause of Miranda's death must be a *sui generis* determination based on the facts in this particular case. The use here of life sustaining equipment merely adds a variation on the theme of criminal causation but does not alter existing law. Accordingly, a statute defining death would not aid the defendant in a case such as this (see *State v Holsclaw,* 42 NC App 696).

Criminal liability for homicide requires that the defendant's actions be a sufficiently direct cause of death (*People v Stewart, supra,* p 697; *People v Kibbe, supra,* p 413), but direct does not mean immediate or unaided (*Cox v People,* 80 NY 500; *People v Brengard,* 265 NY 100). It is enough that defendant's conduct forged a link in a chain of events which brought about the death (*People v Stewart, supra,* p 697). Intervention of a secondary agency constitutes a defense only if the death is solely attributable to it (*People v Stewart, supra; People v Kibbe, supra*).

Regardless of which definition of death is followed, defendant's actions were dangerous to life and were a substantial and sufficiently direct factor in the chain. He set in motion the chain of events which ultimately resulted in the victim's death (*People v Stewart, supra,* p 696; *People v Kibbe, supra,* p 412). It cannot be said that there was an obscure or merely probable connection between the assault and Miranda's demise (*People v Brengard, supra,* p 108; *People v Stewart, supra,* p 697). The bullet wound to the brain was the proximate cause of death and the homicide was properly attributed to the defendant.

The organ removal was not performed to treat or remedy the victim's injuries. Furthermore, this is not an instance "where the death is solely attributable to the secondary agency, and not at all induced by the primary one" (*People v Kane,* 213 NY 260, 270). The prognosis for Miranda's survival, as expressed by all three testifying experts, was very unfavorable.[7] Organ removal would not have been initiated but for the mortal wound. This case is distinguishable from the *Stewart* case (40 NY2d 692, *supra*) on which the defense heavily relies. In *Stewart,* operating surgeons performed unrelated surgical repair on a hernia immediately after attending to a stab wound in the victim's abdomen. One month following surgery the victim died of cardiac arrest. Testimony indicated that probably he would have survived the operation for the stab wound if the other procedure had not been performed. In addition, there was also evidence that the anesthesiologist may have been negligent in failing to oxygenate the victim and this alone could have caused the fatal result. Therefore, the defendant's actions were not a sufficiently direct cause of death (*People v Kibbe,* 35 NY2d 407, *supra*) and his conviction for manslaughter in the first degree was reduced to assault in the first degree (cf. *People v Warner-Lambert Co.,* 51 NY2d 295, 307).

Unlike the stab wound in *Stewart (supra),* the bullet wound to Miranda's brain was operative as the cause of death (accord *People v Roberts,* 73 AD2d 954; *People v Lozano,* 107 Misc 2d 345). Therefore, even if Miranda's doctors were hasty or erroneous in their diagnosis of brain death, and even if they were negligent in disconnecting the life support systems, their intervention would not be a supervening act relieving the defendant from liability (*People v Kane, supra,* p 262). The defendant will be held

---

7. Even the defense expert, Dr. Beresford, was of the opinion that there had been very little chance that Miranda would recover:

"Q * * * Now, let me ask you this question. Doctor, based on your examination of Orlando Miranda's record, the hospital record, based on your reading of the EEG, based on your reading of the autopsy report and everything else you did, what would be your prognosis for Orlando Miranda based upon the injuries that he received?

"A That it's highly likely he would have died, depends — within hours, at most, a few days after the time the kidney transplant was performed. Say it hadn't been performed and he was kept on the respirator and given the best care possible, he would have, I think, probably lived to — hours hours to days. There is an extremely remote chance he could have survived in a vegetative state, but I think that's remote."

accountable "although other factors, entering after the injury, have contributed to the fatal result" (*People v Stewart, supra,* p 697; cf. *People v Cicchetti,* 44 NY2d 803, 804). He is responsible in law and must answer for the consequences of his actions (Ryu, Causation in Criminal Law, 106 U of Pa L Rev 773, 783).

While it is true that Miranda was an ideal source for organ donation because of his young age and otherwise good health, and that speed was essential to the outcome of a successful transplant, there is no indication, as the defense posited in its summation, that untoward motivation existed to hasten the brain death determination before it was warranted. The defendant's argument cannot be accepted that one who acts in good faith, and negligently or by error of judgment shuts off life support machinery, or removes essential organs, is responsible for death instead of the culprit who acts of his own volition and inflicts a massive traumatic wound to the brain with a deadly weapon.

Defendant's identical defense strategy has been raised in other jurisdictions in cases with facts similar to those that are before us. The courts therein have all reached a similar result. The Arizona Supreme Court in *State v Fierro* (124 Ariz 182, 185) held that "removal of life support systems did not change nor alter the natural progression of the victim's physical condition from the gunshot wounds in the head to his resulting death", nor was it " 'indispensible to a conviction that wounds be fatal and the direct cause of death' " (p 184). It was " 'sufficient that they cause death indirectly through a chain of natural effects' " (pp 184-185). There, too, the gunshot wounds were found to be the proximate cause of death though there was a removal of life support systems. The court also noted that a statutory definition of death was not necessary for resolution of the case.

In *State v Shaffer* (223 Kan 244), an expert testified, as did Dr. Beresford, that more tests should have been performed before the pronouncement of death. The doctors determined the victim was brain dead and removed one of his kidneys for transplant and then turned off the respirator. Nevertheless, the defendant was found guilty. The

court stated that (p 250) "[w]here a person inflicts upon another a wound which is calculated to endanger or destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to or caused by the negligence of the attending physicians". The courts uniformly appear to hold that intervening medical error is not a defense to exculpate one who has inflicted a mortal wound to another (*People v Vanderford,* 77 Mich App 370; *People v Olson,* 60 Ill App 3d 535; *Cranmore v State,* 85 Wis 2d 722, *supra*). Of course, the "acts of the defendant must be a real cause, a cause without which the decedent's death would not have occurred" (*State v Holsclaw,* 42 NC App 696, 699, *supra*) whether they "contribute either mediately or immediately to the death" (*Swafford v State,* __ Ind __, __, 421 NE2d 596, 602, *supra*). Therefore it becomes immaterial to defendant's guilt whether death is pronounced before or after the life support system is disconnected (*People v Vanderford, supra*).

Finally, we consider the learned Trial Justice's very thorough instructions to the jury.[8] The charge included six possible crimes and covered the many permutations of intent, causation, recklessness, effect of intoxication and intervention of a secondary agency. Also before the jury was the credibility, persuasiveness and conflicting clinical opinions of the three experts, and various medical protocols. Nonetheless, it found the defendant guilty of manslaughter in the first degree in that he intended serious harm and caused death; and, in addition, it found him guilty of criminal possession of a weapon in the second degree.

The finding by the trier of fact against the defendant now entitles the prosecution to the most favorable view of the evidence. This includes the indulgence in all permissible inferences in its favor (*People v Benzinger,* 36 NY2d 29, 32; *Matter of Kornblum Metals Co. v Intsel Corp.,* 38 NY2d 376). It is also well settled that a reviewing court will not supplant the determination of the jury where the verdict is supported by the weight of the evidence (*People v O'Brien,* 48 AD2d 446). It cannot be said as a matter of law that the

---

**8.** Justice KOOPER's charge on the issue of causation favorably compares with the charge in *People v Kane* (213 NY 260, 269-270). Moreover, it included the most recent principles of criminal causation enunciated by the New York Court of Appeals.

jury's finding is wrong or that failure to charge a definition of death is error when a jury charge is as thorough and detailed as that made in this case.

Accordingly, the judgment should be affirmed.

NIEHOFF, J. (concurring). Although I am in total agreement with the end result reached by Justice RUBIN in his exceptionally thorough and scholarly opinion, namely, that the defendant's conviction of manslaughter in the first degree and criminal possession of a weapon in the second degree should be affirmed, I arrive at such conclusion by means of a somewhat different line of reasoning. Whereas Justice RUBIN appears to be of the view that no definition of death was necessary in the charge to the jury, and that there is no need for this court to discuss the Trial Judge's unwillingness to define the term for the jury, my belief is that under the circumstances of this case a definition of death, as accepted by the common law, was called for, and that it would have been preferable to impart it. Nevertheless, the Trial Judge's refusal to give that definition, as such, does not require a reversal because the charge was so skillfully structured that it made clear to the jury that by death the court meant what is commonly understood as death, and that which the common law acknowledges to be death, viz., cessation of respiration and heartbeat. As Black's Law Dictionary (5th ed, p 360) states, death is "[t]he cessation of life; permanent cessations of all vital functions and signs".

In *People v Kane* (213 NY 260) the Court of Appeals laid down the rule for determining a defendant's responsibility for homicide where the defendant has feloniously assaulted someone and there are intervening medical acts before death actually occurs. There, the court wrote (p 270): "If a felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for the homicide. It is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense."

More recently, in *People v Stewart* (40 NY2d 692, 697), the Court of Appeals restated the rule as follows:

"One accused of homicide, of course, cannot be convicted unless it is shown that he 'cause[d] the death of a person' (Penal Law, § 125.00). No matter what degree of homicide is charged this is always an essential element which the People must prove beyond a reasonable doubt (*People v Brengard,* 265 NY 100, 108). This means that the prosecutor must, at least, prove that the defendant's conduct was an actual cause of death, in the sense that it forged a link in the chain of causes which actually brought about the death (see, e.g., Perkins, Criminal Law, 687). But something more is required before his conduct will be recognized as a legal cause of death warranting criminal sanctions. The requirement here is that 'the defendant's actions must be *a sufficiently direct cause* of the ensuing death before there can be any imposition of criminal liability' (*People v Kibbe, supra* [35 NY2d 407], at p 413). Thus an 'obscure or merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide' (*People v Brengard, supra,* p 108).

"We have held that 'direct' does not mean 'immediate'. The defendant may be held to have caused the death even though it does not immediately follow the injury (see, e.g., *Cox v People,* 80 NY 500; *People v Brengard, supra*). Neither does 'direct' mean 'unaided' for the defendant will be held liable for the death although other factors, entering after the injury, have contributed to the fatal result. Thus if 'felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for homicide' (*People v Kane,* 213 NY 260, 270). But if 'the death is solely attributable to the secondary agency, and not at all induced by the primary one * * * its intervention constitutes a defense' (*Kane, supra,* at p 270)".

In this case the Trial Judge faithfully followed the *Kane-Stewart* standard in charging the jury, and the members of the jury had sufficient evidence before them to conclude that the *Kane-Stewart* test for homicide responsibility had been met.

That is, the record contains evidence sufficient to have warranted a factual finding by the jury to the effect that

the bullet which the defendant fired into the brain of "Little Man" Miranda was a "sufficiently direct cause" of Miranda's ensuing death. Phrased otherwise, the evidence justified the jury verdict that the defendant was criminally responsible for the death of his victim because the gunshot wound to the head was a mortal one, i.e., one which forged a link in the chain of causes which actually brought about Miranda's death. Although the victim's kidneys and spleen were removed while he was still "alive", the jury had the right to find that the removal of those organs came about only after there was ample evidence to support the conclusion that the bullet wound would inevitably produce death.

At the trial the defendant was claiming that the death of the victim was caused by the removal of his kidneys and spleen. While it may be argued that the kidney-spleen removal surgery was an agency which contributed to changing the *time* of Miranda's death (i.e., advanced it somewhat) it cannot be said on the record before us that the jury erred in concluding that the operation was not an independent causative factor of the death, or, in concluding that death was inevitable from the bullet.

The evidence with regard to "brain death" that was introduced by both sides was relevant in that it had a bearing on the nature of the wound inflicted by the defendant, i.e., mortal or otherwise. The prosecution sought to show that the wound was a grievous one — one which produced the irreversible cessation of all functions of the brain. On the other hand, the defendant hoped to show that it did not have that effect. However that may be, the proof of brain death was not determinative on the question of defendant's culpability for the death of the gunshot victim. Rather, the thrust of the proof was directed towards the defendant's claim that death was caused not by the bullet wound in Miranda's head but by an independent intervening agency. As will be seen during the discussion of the trial court's charge which follows herein, the ultimate issue in this case was not whether Miranda suffered brain death before the nephrectomy. Rather, it was whether the People had established beyond a reasonable doubt that the shooting of Miranda by the defendant was a cause of Miranda's death as the word death is commonly and tradi-

tionally understood, namely, the cessation of respiration and heartbeat. Stated differently, the issue which was tried and the issue which was submitted to the jury was whether it was the bullet lodged in Miranda's brain which caused the death (as commonly understood) or whether the death was *solely attributable* to a " 'secondary agency, and not at all induced by the primary one' " (*People v Stewart, supra,* p 697).

On the present appeal, the defendant maintains that the Trial Judge committed reversible error in her charge to the jury when she refused to instruct the jury on the definition of death. In essence, the defendant contends that the definition of death was a material legal principle applicable to this case which was crucial to the jury's determination and that the court's failure to so charge deprived him of due process of law as a consequence of which his manslaughter conviction must be set aside.

CPL 300.10 (subd 2) requires a court in its charge to "state the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts". In my view, the Trial Judge's charge complied with the mandates of that section.

It must not be forgotten that throughout the trial there was really no doubt that the defendant shot Miranda and that Miranda died a short time later at Brookdale Hospital. Thus, the only real issue for the jury's determination was whether the bullet which lodged in Miranda's brain was a cause of his death.

On appeal, the defendant argues that the trial court should have instructed the jury that death occurs when respiration and heartbeat cease, i.e., the common-law definition of death. This argument is made notwithstanding the fact that defense counsel specifically requested the court to charge a definition of brain death — not a definition of common-law death.

However that may be, I am satisfied that a review of the court's charge against the background of this case compels the conclusion that there is no substance to defendant's argument that he was denied due process because the court failed to define death to the jury in terms of cessation of respiration and heartbeat.

In his opening statement defense counsel stated to the jury: "I submit to you, based on the law that the Judge will give you, that though the gunshot wound took him to the hospital, there was an independent intervening factor, the action of the hospital, the people in the hospital, their preoccupation to get the kidneys out of this 19 year old which actually caused the death".

At the close of the People's case defense counsel moved for a trial order of dismissal on the grounds that (1) "we have an intervening factor. The intervening factor being the removal of the deceased's kidneys and spleen for transplantation"; and (2) because the People failed to meet their burden of proof "that the specific act of the defendant was the intentional and the direct and immediate cause of the death of the deceased, they have failed to sustain the burden of proof sufficient to charge the defendant with any charge of homicide".

The court denied the motion because Dr. Wald, the medical examiner, "was unequivocal and positive in his statement as to the cause of death, that it was not due to taking the defendant [*sic*] off the respirator, it was not the transplantation of the kidneys, and that he determined his results from the autopsy and not from information received at the hospital".

Following the completion of an extensive precharge conference, defense counsel expressed his general satisfaction with the proposed charge. He indicated that the only problem he had with it was that he was going to ask for a charge on the definition of death, i.e., "I am going to ask you to charge the latest standard, which I gave you: That brain death is defined as the irreversible cessation of all functions of the brain." The court declined to charge in that manner noting that "we have no law in New York that defines death" and that "if the definition of death is to become irreversible cessation of brain function, the change should be accomplished explicitly through an appropriate statute". After further debate, the Judge stated: "My decision at this point is not to define death. I have read you five different definitions from God knows how many states. We don't have a definition here, and I am not going to select

one or arbitrarily decide which should be used. I don't even think its a responsibility of mine to do as a Judge".

In my view, the Trial Judge's deliberate, informed decision not to charge the requested definition of *brain death* was correct. No such definition is recognized in this State and if such a definition is to be adopted it should be by means of legislative enactment.

Having concluded that the court did not err in refusing to charge a definition of brain death, I now turn to the question of whether the court's charge made adequate provision for the definition of death as it is recognized in New York State, i.e., the common-law definition of death. If that definition of death was necessary in order for the jury to arrive at a proper verdict and if the charge failed to apprise the jury, expressly or impliedly, of the New York standard, then the charge must be construed as erroneous and further consideration will be mandated to determine if the error was harmless. If, on the other hand, the common-law definition of death was not required, or the court's charge made the jury sufficiently aware of New York's common-law definition of death, then the charge was error free in that regard.

Inasmuch as the jury heard testimony about "brain death" and its definition from witnesses on both sides, it is my view that to eliminate the possibility that the jury would convict the defendant of homicide solely on the basis of the evidence that he had caused the "brain death" of Miranda, it would have been preferable in this case for the court to have given the jury the traditional definition of death, thereby making it crystal clear for the jury that defendant could be guilty of homicide only if his acts caused the cessation of Miranda's respiration and heartbeat. However, as noted at the opening of this opinion, I am satisfied that while the court did not expressly give a definition of death, as such, the court so carefully fashioned the charge that it was made manifest to the jury that by death the court meant that which is commonly understood as death, namely, cessation of respiration and heartbeat. That is, the charge thoroughly covered the issues involved and enabled the jury to render a fair and just verdict

notwithstanding that an explicit definition of death was not given.

After reading the contents of the indictment, the Trial Judge charged the jury as follows:

"The term homicide means conduct which causes the death of a person under circumstances constituting murder in the second degree, manslaughter in the first degree and manslaughter in the second degree.

"When referring to the victim of a homicide, the term person means a human being who has been born and is alive. You cannot commit a homicide upon a dead person * * *

"You will note that our law requires the defendant to have had the specific intent to cause the death of Orlando Miranda before you may convict him * * *

"Thus, you must determine whether the prosecution has convinced you beyond a reasonable doubt that the defendant, in fact, intended to cause the death of Orlando Miranda. According to the law, a person intends to cause the death of another person when his conscious aim or objective is to cause the death of that person * * *

"It is the People's position in this case that the defendant shot Orlando Miranda with the intent to cause his death and, in fact, did cause his death.

"The defendant, by his plea of not guilty, contends that he did not shoot Mr. Miranda. *However, even if you find that the defendant did shoot Mr. Miranda, the defendant claims that he did not cause Miranda's death, but that Miranda's death was caused by the acts of the doctors at Brookdale Hospital Medical Center in removing Mr. Miranda's kidneys and taking him off the life support systems, acts which he says were unnecessary for the treatment of the head wound.*

"I remind you that one accused of homicide cannot be convicted unless it is shown that he caused the death of the deceased. No matter what degree of homicide is charged this is always an essential element which the People must prove beyond a reasonable doubt. *This means that the People must, at least, prove that the defendant's conduct was*

*an actual cause of death, in the sense that it forged a link in the chain of causes which actually brought about the death.*

"But something more is required before his conduct will be recognized as a legal cause of death warranting criminal sanctions. The requirement here is that the defendant's actions must be a sufficiently direct cause of the ensuing death before there can be any imposition of criminal liability. Thus, an obscure or merely probable connection between the shooting and the death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide.

"Now, *direct does not mean immediate.* The defendant may be held to have caused the death even though death did not immediately follow the injury. Neither does direct mean unaided for the defendant to be held liable for the death although other factors, entering after the injury, have contributed to the fatal result. *Thus, if the wounding of the deceased was operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment, if any, would not relieve the perpetrator from liability for the homicide. But if the death is solely attributable to the secondary agency, which the defendant alleges the kidney transplant was, and not at all induced by the primary one, the bullet in the head, its intervention constitutes a defense to murder in the second degree, manslaughter in the first degree and manslaughter in the second degree.*

"I remind you that one accused of homicide cannot be convicted unless it is shown that he caused the death of the deceased. Thus, the same law which I explained to you regarding murder in the second degree and manslaughter in the first degree concerning causation of death obtains regarding this crime — manslaughter in the second degree" (emphasis supplied).

After listening to counsel's exceptions the court continued its charge to the jury as follows: *"In case I did not make it clear, the lesser included non-homicide counts, attempted murder, assault in the first degree and assault in the second degree only become operative if you believe that the death of Orlando Miranda was caused by the doctors in removing the kidneys of the deceased and disconnecting his life sup-*

*port system. It is the People's contention that the death was caused by the defendant's acts*" (emphasis supplied).

The indictment charges that defendant caused the death of Orlando Miranda by shooting him with a loaded firearm. As pointed out above, the Trial Judge focused the jury's deliberations on the question of whether Miranda died because of the injury inflicted by the defendant or because of the removal of the kidneys.

From a reading of the charge as a whole it is clear that the jury was being told that if the bullet wound was a proximate cause of Miranda's death, as commonly understood by laymen and as recognized by the common law (common-law definition) the defendant committed homicide, whereas if Miranda's death was caused solely by the secondary agency (the doctors' acts of removing the kidneys) the defendant could not be legally charged with homicide.

To phrase it somewhat differently, from the above-quoted excerpts it is clear that the Trial Judge plainly treated the time of Miranda's death as taking place *after* the organ transplantation and the jury could not reasonably have believed that she was referring to death as having occurred at some point earlier in time. The charge required the jury to consider the "independent intervening agency" defense on the merits before concluding that the defendant was guilty.

If the jury in this case had been given the definition of death urged by defendant, namely, brain death, it would have served one purpose and one purpose only, i.e., to establish a time of death sometime prior to the organ transplantation procedure. A finding to the effect that Miranda's death occurred prior to the nephrectomy would have lead to an improper verdict since under the present state of the law one cannot be guilty of homicide in this State for causing brain death. Moreover, such a finding could only work against the defendant's intervention defense. Since the Trial Judge's charge required the jury to consider the independent intervening agency defense, the defendant cannot successfully maintain that the jury may have improperly convicted him of homicide because the trial court did not give the jury the common-law definition

of death. In sum, the trial court cannot be faulted for failing to charge brain death and, for the reasons above, I see no basis in this case for reversing the conviction simply because the trial court failed to expressly give the common-law definition of death.

Accordingly, I believe the judgment of conviction should be affirmed.

TITONE, J. P. (dissenting in part and concurring in part). In the absence of a "brain death" standard, which I, too, am unwilling to adopt as a matter of judicial fiat, the evidence is legally insufficient to establish that the defendant caused the decedent's death. Evidentiary insufficiency aside, the trial court erred in refusing to define for the jury the point at which death occurs. Inasmuch as these questions have been preserved for appellate review, the judgment should be modified by reducing the conviction for manslaughter in the first degree to assault in the second degree. Alternatively, I would order a new trial.

I

We all agree that it is inappropriate to judicially adopt a brain death standard. My reasons rest upon both moral considerations and the need for judicial restraint in an area peculiarly statutory.

First, judicial enunciation of such a standard is contrary to a long-standing tradition in this State, only recently reaffirmed (see *Murphy v American Home Prods. Corp.,* 58 NY2d 293, 301-302), that an appellate court should not, within the context of adversary litigation, usurp the legislative prerogative to change a settled rule of law when the standard sought to be substituted is itself a changing flexible one such as brain death (see *Dolphin Lane Assoc. v Town of Southampton,* 37 NY2d 292, 296 ["If a change is to be made in the procedures for locating shore-side boundary lines to conform more precisely to hydrographic data, in our view, such innovation should be left to the Legislature."]).[1] Since medicine is an evolving science, what con-

1. I understand that the Los Angeles County District Attorney's office, which employs brain death criteria by statute, picks among several standards, depending upon the expert called upon in the case. I would be loath to hinge guilt or innocence upon an expert's opinion of whether or not a homicide has occurred (cf. *People v Ciaccio,* 47 NY2d 431, 439; *People v Williams,* 6 NY2d 18, 23; *People v Graydon,* 43 AD2d 842, 843).

stitutes an appropriate definition of death might require some elasticity.[2]

The simple observation that life is the primary value of all living organisms is so basic that it is often unstated. Yet, it is the foundation of our constitutional guarantee of life and serves as a recognition that society retains the ultimate right to decide what criteria should be used to declare that life is extinguished. Before a new definition of death is adopted, a thorough exploration of the standard and its effects is necessary (see *Murphy v American Home Prods. Corp.*, 58 NY2d 293, 301-302, *supra*). The task of such an articulation should be deferred to the Legislature. "Unlike the Legislature, the courts are neither equipped nor empowered to prescribe substantive or procedural rules for all, most, or even the more common contingencies. Our role, especially in matters as sensitive as these, is limited to resolving the issues raised by facts presented in particular cases" (*Matter of Storar,* 52 NY2d 363, 370).

We cannot defer to the medical profession on this question. Its expertise lies in providing health care and not in defining death on a moral or philosophical basis (cf. *Matter of Storar, supra,* pp 376-378). Recognition of this limitation is implicit in the protocol on brain death issued by the Harvard Medical School in 1968 (205 J Amer Med Assn 337), which essentially urged that benefits would come about by society's acceptance of the brain death standard (see Ufford, Brain Death/Termination of Heroic Efforts to Save Life — Who Decides?, 19 Washburn LJ 225, 234).

It cannot be denied that death has a philosophical component. The process of death consists of two levels. One relates to the death of the body which is a physical phenomenon occurring in a series of measurable events. The other is associated with the passing of the person, which is

2. The Kansas statute, for example, has been both praised (Mills, The Kansas Death Act: Bold and Innovative, 285 New Eng J Med 968) and condemned (Kennedy, The Kansas Statute on Death, 285 New Eng J Med 946). (See, also, Capron & Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal, 121 U of Pa L Rev 87 [critical of Kansas statute, proposing different criteria]; O'Hara, Medical-Legal Agreement on Brain Death: An Assessment of the Uniform Determination of Death Act, 8 J of Contemp L 97, 118 [calling for uniformity]; Robinson, Determination of Death Legislation, 27 Cath Lawyer 246, 247 [same]; Note, The Uniform Determination of Death Act: An Effective Solution to the Problem of Defining Death, 39 Wash and Lee L Rev 1511, 1520 [same].) In this case, there was testimony to the effect that the criteria shift almost weekly.

a nonphysical process, poorly defined and largely un-measurable. This second element is connected with moral and philosophical concepts not within the concern of the medical profession. (See Showalter, Determining Death: The Legal and Theological Aspects of Brain-Related Criteria, 27 Cath Lawyer 112, 114-116 and authorities cited therein.)

Brain death as it is defined in the record before us refers only to the death of the body. While I believe that the common law is adaptable enough to expand and include a new physical definition of death, it is a poor vehicle for sorting the different views of a noncohesive society or to assess the value judgments implicit in the acceptance of such a standard (cf. *Murphy v American Home Prods. Corp., supra; Matter of Storar, supra*).

I must stress that I do not deny the biological fact of brain death. Actually, a brain death standard is implicit in the common-law notion that death occurs when the heart-beat and circulation ceases (O'Hara, Medical-Legal Agreement on Brain Death: An Assessment of the Uniform Determination of Death Act, 8 J of Contemp L 97, 99). Death has always been defined in terms of its causes and for all practical purposes death is never declared until brain death has occurred. When circulation and respiration cease, the time of death is not fixed until after the brain has been starved of oxygen long enough to die completely, about five minutes (Biörck, When is Death?, 1968 Wis L Rev 484, 493; Walker, Cerebral Death, p 41).

In contrast, under the brain death standard the process of brain death occurs over a much longer time. The usual testing interval is 24 hours and it is possible, using the criteria advanced by the medical profession, to declare brain death while portions of the brain are still alive but in the process of dying (see O'Hara, *op. cit.,* pp 99-100).

As a society we are acclimated to thinking that the transition from person to corpse occurs in a moment (see *Evans v People,* 49 NY 86). The brain death standard requires an adjustment in our viewpoint. No one is pre-pared to bury a "corpse" whose heart is still beating. Yet, acceptance of a brain death standard may not make such a course unthinkable.

Having watched a significant number of people die slowly from various causes, I personally recoil from a standard the purpose of which is to value a dying person as the sum of his spare parts. Nevertheless, I cannot deny that there are social and moral costs in mistaking and confusing a person with his corpse. If the capacity to think, respond and regulate bodily functions is irretrievably lost, it is not appropriate to continue treating the corpse as a person and thereby deprive other living persons of needed organs which can be salvaged from the corpse. (Compare Brain Death, 148 America 234, with Paris & Cranford, Brain Death, Profile and Catholic Confusion, 147 America 345.)

Again, the words "irretrievably lost" must be stressed, because in none of my reading has the margin for error under the brain death standard been discussed. Nonetheless, there have been macabre mistakes. Do the mistakes relate to the level of competence of the declaring physician or to the state of the art? Can protocols which were developed by whole medical schools be modified, as occurred in this case, and still be effective? I have no answers to these inquiries and the record provides none. They are dilemmas to be resolved by the Legislature.

Another aspect for the Legislature's attention is the medical profession itself. Utilizing the brain death standard, many members believe, will result in criminal and civil liability for physicians (Paris & McCormick, Living — Will Legislation, Reconsidered, 145 America 86, 88, quoting Prof Robert A. Burt of Yale Univ). Will the public's fear of falling victim to what it perceives as the profession's arrogance, avarice and ambition, increase when it recognizes that the criteria for declaring brain death, unlike common-law death, is peculiarly within the profession's expertise and control? Will it be alleviated by requiring that the declaration be made by more than one physician?

Finally, the Legislature must consider the impact of brain death on traditional concepts of criminal law. For example, in this case the medical examiner could not testify to the time of death. He was dependent on the hospital's timing of the declaration because the physiological breakdown of the brain is very slow. Nevertheless the

timing of death is a critical factor in presenting and refuting an intervention. An additional aspect of the causation problem is that the subsequent organ harvesting operation has the potential to kill from shock and pain, but is unrelated to the victim's treatment for the wounds inflicted by a defendant. Perhaps, a penal statute fixing the same penalty for criminal acts causing brain death or a vegetative state as those that cause common-law death, may prevent causation problems without the necessity of adopting the brain death standard (see discussion, *infra,* p 435, n 7, and Capron, The Purpose of Death: A Reply to Professor Dworkin, 48 Ind LJ 640 [recommending such an approach]).

Another area for concern derives from the recognition that brain death is a declaration based on interpretations of delicate variables and that death could be seen as an opinion rather than as fact (cf. Kovaler & Vermel, The Legal Definition of Death, World Health, Nov., 1982, p 5). It is for the Legislature to decide whether such uncertainty should be interjected in the criminal sphere or whether it should bring "some order and design [to] an area which is so very important to society and which is already replete with complexity and confusion". (Robinson, Determination of Death Legislation, 27 Cath Lawyer 246, 253.) Consequently, I agree that the court properly declines the invitation to judicially adopt a new standard to replace the common-law definition of death.

## II

Defense counsel's application for a trial order of dismissal, made at the close of the People's case, was posited on the grounds that there was an "intervening factor [,] [t]he intervening factor being the removal of the deceased's kidneys and spleen for transplantation" and that the People failed to prove "that the specific act of the defendant was the intentional and the direct and immediate cause of death of the deceased". By that motion, the issues now before us were "brought to the attention of the Trial Judge in ways that pinpointed the legal question", thereby preserving them for appellate review (*People v Cobos,* 57 NY2d 798, 800; see, also, *People v Cona,* 49 NY2d 26, 37, n 3).

At the onset, I would note that the People have changed tunes on appeal. At trial, the People's initial theory hinged on a finding of brain death. They found the definition of common-law death unacceptable. Now the People claim that common-law death is the applicable standard and that brain death is a nonissue which they mention only in passing because the defendant has raised it. As the Court of Appeals has made clear, preservation requirements apply to prosecutor and defendant alike and the People's failure to preserve will be binding upon them on a defendant's appeal (*People v Bell,* 48 NY2d 913, 915).

Prior to trial, the court informed the attorneys that it would charge brain death. The defendant had no objection. There is no indication in the record, however, that either the court or the attorneys were of the view that because brain death was to be charged common-law death could not be. Common-law death was in fact the culmination of the defendant's argument. He asserted that brain death had not been proven and that the organ harvesting operation, which was unrelated to the victim's treatment, had caused the common-law death of the victim. The defendant maintained this position consistently throughout the trial.

Although the defendant used a faulty brain death standard as the premise of his argument, he was not dependent on the concept. If the court had initially taken the position that brain death was not a permissible standard, the defendant's major argument would still have been that the transplant operation caused the common-law death of the victim. Thus, brain death and common-law death were not mutually exclusive on the facts of this case. The defendant merely employed both definitions to separate the two stages of his intervening cause defense.

At the end of the trial, the court and the attorneys discussed the instructions to be given to the jury. During the discussion on causation, the defendant asked the court to define the organ harvesting operation as a secondary agency unrelated to the victim's treatment, because if the jury agreed with the prosecutor "they will never get to the kidney transplant — that he is dead, and that's it, and we caused it".

Immediately after this request, the defendant asked the court to charge a definition of death, specifically requesting a definition of brain death. The court refused. The defendant then attempted to explain how brain death related to a cessation of respiration or common-law death. But it should not be assumed that the defendant abandoned his two-step analysis of causation by first requesting a charge on brain death. The court's reply indicated a view which would preclude a subsequent request for a charge on common-law death:

"THE COURT: We have no law in New York that defines death. What you are asking me to do is decide this as a matter of law when there is no law to guide me.

"MR. FELDMAN [Assistant District Attorney]: What are you going to —

"THE COURT: I am not going to.

"MR. FELDMAN: You are just going to use the term death?

"THE COURT: Yes.

"MR. MOSER [defendant's attorney]: What I am actually asking the Court is that I am submitting to you that it is a question of law. Absent the law, you have got to make the law. We have to have a starting point. And if a jurist is not going to start from someplace, we are never going to get it. I don't think it is a point where you are actually usurping the Legislature in this state. *I think what you have to do is to say and define death so that the jury can determine as a question of fact when death did occur. In that way, if they find that everything was properly done and accept the testimony of my expert or, in reverse, if they accept the testimony of the People's witnesses, then they can determine that death occurred at the time it was pronounced. If they accept my position, then they have to determine that death followed the*

"THE COURT: I think it's a question for them to determine.

"MR. MOSER: Yes, when death occurred is to be determined. How can they possibly determine when something occurred if they don't know what that something is?" (Emphasis supplied.)

It is interesting to note that the court did not limit its ruling to brain death and that the defendant did not limit his argument and the use of the term death to brain death.

The court then asked the prosecutor if he too were requesting a charge on death since the court felt that if the prosecutor joined in the request there would be no problem with instructing the jury on a definition of death. Various definitions were explored. The discussion, however, did more to highlight the differences in the understanding of the attorneys as to brain death than to resolve the problem of the charge. The court then read one final statutory definition to the attorneys: "A person shall be medically and legally dead if (a) in the opinion of a physician duly authorized to practice medicine in this state, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and spontaneous cardiac functions and because of the disease or condition which directly or indirectly causes these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation would not, in the opinion of such physician, be successful in restoring spontaneous life sustaining functions, and in such event death shall have deemed to have occurred at the time these functions ceased. Or, in the opinion of a consulting physician who shall be duly licensed and a specialist in the field of Neurology, Neuro-surgery or Neuro-encephalography, when based on ordinary standards of medical practice, there is an absence of spontaneous brain function and spontaneous respiratory functions, and in the opinion of the attending physician, based on the ordinary standards of medical practice and considering the absence of the aforesaid spontaneous brain functions and spontaneous respiratory functions and the patient's medical records further attempts at resuscitation or continued support of maintenance would not be successful in restoring such spontaneous function, in such event death shall have been deemed to have occurred at the time when these conditions first coincided."

This incorporated both common-law and brain death definitions. Yet, with respect to brain death, it must be noted that lack of spontaneous respiration was added to

this particular formulation. This additional element created total confusion in the discussion that ensued.

As the following colloquy demonstrates, the trial court was under a continuing misimpression that it was being asked by the defendant to choose between brain death and common-law definitions rather than to separate the definitions as per the factual stages of the causation defense. The prosecutor objected twice to the inclusion of the definition of common-law death. Defense counsel agreed to the common-law definition of death as contained in the statute read by the court. He mistakenly understood the prosecutor's position, however, as an objection to the lack of respiration being included as an element of the definition of brain death rather than as an objection to common-law death.

"THE COURT: * * * Now, you see, there [are] two different things. You're asking me to pick one.

"MR. FELDMAN: The first one creates a problem.

"MR. MOSER: You know what that definition does?

"THE COURT: You don't want me to define death. You want me to define death the way you want it.

"MR. MOSER: *No, I will accept it for the respiration end of it.* [Common law death].[3] This last thing incorporates every possible definition. [Brain death with lack of respiration.]

"MR. FELDMAN: The first one is unacceptable.

"MR. MOSER: Including the additional definition, and that's what we just don't want. It would be great for me because his heart was working. His heart was pumping * * *

"THE COURT: My decision at this point is not to define death. I have read you five different definitions from God knows how many states. We don't have a definition here, and I am not going to select one or arbitrarily decide which should be used. I don't even think it's a responsibility of mine to do as a Judge." (Emphasis supplied.)

The next day defense counsel went to a fall-back position made necessary by the court's refusal to define death

---

3. Common-law death is defined as meaning a "total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." (25A CJS, Death, § 1, p 546).

pursuant to successive stages of the causation defense. He asked that two certified questions, designed to insure that the jury thought in accordance with the structure of his defense, be presented to the jury. The first question required the jury to define death. The second asked that they determine when it occurred. The court declined. At the conclusion of the charge the defendant renewed his requests.

In the context of the court's attempt to settle the question of whether brain death should be charged, an instruction on common-law death was suggested by defense counsel. The distinction offered by counsel went unnoticed by the court which held to its earlier decision of refusing to charge any definition of death.

Given the confusion engendered by the court's misunderstanding of the defense strategy and the court's announced determination that no charge on the definition of death would be given, it would have been futile for defense counsel to further press his position (*Kalisch-Jarcho, Inc. v City of New York,* 58 NY2d 377, 383). Defense counsel maintained a consistent defense strategy throughout the trial and explained the need for a charge on the definition of death. He requested both a charge on brain death and common-law death. A "mere emphasis of one prong of attack over another or a shift in theory on appeal, will not constitute a failure to preserve" (*People v De Bour,* 40 NY2d 210, 215) and will not constitute a waiver (*People v Le Mieux,* 51 NY2d 981, 982-983). In face of the court's refusal to charge any definition, defendant "without success * * * expressly or impliedly sought or requested a particular ruling or instruction" and thus "is deemed to have thereby protested the court's ultimate disposition of the matter * * * sufficiently to raise a question of law with respect to such disposition * * * regardless of whether any actual protest thereto was registered" (CPL 470.05, subd 2; see *People v Cobos,* 57 NY2d 798, 800, *supra; People v Le Mieux, supra*).

## III

The majority opinions resolve the troublesome issues presented by holding that the People have proven beyond a reasonable doubt that the defendant's conduct in inflicting

the head wound on Miranda was the cause of the latter's death even under its common-law definition. They reason that the infliction of such wound prevents a finding that the victim's death was solely attributable to the purported secondary agency of misdiagnosed brain death and the subsequent operation for organ harvesting. Proof of brain death is irrelevant since "but for" that wound the victim would not have been in a position to die from the operation.

The difficulty with this approach is that it blurs the distinction between an accused's culpable act and intervening causes. "The basic theory of causation is that the culpable act or omission must be a causa sine qua non (inevitable or necessary cause)" (Clark & Marshall, Crimes [7th ed], § 4.01, p 210). Since the concept of "'causing death' normally involves the notion of shortening life and not merely determining the manner of dying" (Hart & Honor, Causation in the Law, p 220), "one who hastens the victim's death is a cause of his death" (LaFave & Scott, Criminal Law, § 35, p 250). So, if the defendant has inflicted a wound which would prove fatal and a third party comes along while the victim has but hours to live and kills him instantly, the third-party's act substantially hastening death constitutes the cause of death and the defendant cannot be convicted of homicide (*State v Scates,* 50 NC [5 Jones] 420; *State v Wood,* 53 Vt 560; 1 Hale, The History of the Pleas of the Crown, pp 427-428; Hall, General Principles of Criminal Law [2d ed], p 267; LaFave & Scott, *op. cit.,* p 250; cf. Clark & Marshall, Crimes [7th ed], § 4.01, pp 216-219).[4]

*State v Wood* (53 Vt 560, *supra*) illustrates the flaws in the analyses of Justices RUBIN and NIEHOFF. In that case, the trial court instructed the jury that although the victim died of the wound inflicted by another, acting independently, and not that inflicted previously by the defendant, "still if the wound inflicted by Wood was mortal, and would in course of time have killed [the victim], if he had not previously died from the wound inflicted by [the third person], and although he did not die of the wound by Wood, yet the latter could be convicted of murder" (53 Vt, at p

---

4. Of course, the defendant could still be charged with attempted murder (see *People v Dlugash,* 41 NY2d 725).

566). As the Vermont Supreme Court explained in reversing Wood's conviction (p 566), "The court was in error in the assumption that a man can be convicted of murder although his act does not cause the death. The question does not turn upon the moral aspect of the case. The intent to murder may be never so plain, yet if something intervenes to prevent the consummation of the intent, if death does not follow from the act of the accused, he is not in law a murderer".

True, when the culpable act produces the intervening cause the defendant remains liable for all foreseeable consequences (Clark & Marshall, Crimes [7th ed], § 4.01, p 213; Focht, Proximate Cause in the Law of Homicide — With Special Reference to California Cases, 12 So Cal L Rev 19, 33-34). Medical treatment for a wound is an intervening cause of this sort because acts of ordinary medical malpractice are foreseeable: "mere negligence in medical treatment is not so abnormal that the defendant should be freed of liability" (LaFave & Scott, *op. cit.*, p 259; see *People v Kane,* 213 NY 260). After all, defendant's conduct exposed the victim to the medical procedures and it is not unjust to hold him responsible for the attendant risks.

Nonetheless, responsibility does not extend to all intervening acts to which the victim would not have been exposed "but for" the defendant. The defendant is not liable for acts of gross negligence or intentional malpractice (LaFave & Scott, *op. cit.,* p 259; cf. *People v Stewart,* 40 NY2d 692 [operation on unrelated hernia]). He is likewise not liable for coincidences, as, for example, if the victim dies in a traffic accident attributable to the negligence of the ambulance driver who is taking the victim to the hospital (LaFave & Scott, *op. cit.,* p 259). The victim would not have been in the ambulance "but for" the defendant's conduct. But the traffic accident was too remote; it was not foreseeable (cf. *People v Kibbe,* 35 NY2d 407). As LaFave and Scott point out (*op. cit.,* p 259), for causation purposes "the medical negligence cases have usually emphasized that the negligence aggravated the wound inflicted by the defendant".

Reliance upon this theory of intervening cause is therefore misplaced. Defendant may have exposed the victim to treatment for the wound but not the organ harvesting operation because the physician's acts were intentional, not negligent. It should be self-evident that such operation hardly constitutes an accepted method of treatment for an injury.

Moreover, the declaration of brain death and subsequent operation were not foreseeable. The whole purpose of such an operation is to benefit other patients. It does not absolutely follow brain death unless the permission of the next of kin is obtained. The medical procedure is still relatively uncommon and the state of the art is far from the point where brain death determinations are certain (LaFave & Scott, *op. cit.,* § 67, p 533). Flat EEGs may also be caused by trauma, cardiac arrest and barbiturate overdoses (Hamlin, Life or Death by EEG, 190 J Amer Med Assn 112).[5]

None of the cases cited by Justice RUBIN involves comparable issues of causation. In *Commonwealth v Golston* (373 Mass 249, cert den 434 US 1039), *State v Shaffer* (223 Kan 244)[6] and *Swafford v State* (__ Ind __, 421 NE2d 596), there was evidence that death had occurred prior to the disconnection of the life support systems and the jury was instructed that it would have to so find in order to return a conviction. While no instruction was given in *Cranmore v State* (85 Wis 2d 722), there was no conflict in medical testimony, all the experts testified that death had taken place prior to the operation. *State v Fierro* (124 Ariz 182) did not involve removal of organs and the court viewed the termination of life support systems as just passively stepping aside (see, also, *People v Mitchell,* 132 Cal App 3d 389, 396-397, where the court noted that different considerations might pertain in organ transplant cases).

As commentators have noted, causation cannot supply an escape from determination of the appropriate standard of ascertaining when death has occurred. If the patient

---

5. I note with interest the recent indictment of two Los Angeles physicians for murder (*New York Times,* May 6, 1983, p 14, col 6). Newspaper accounts indicate that they may have acted too quickly in removing a victim's organs (*New York Times,* May 6, 1983, p 14, col 6; March 10, 1983, p 18, col 1; Feb. 7, 1983, p 10; Sept. 15, 1982, p 16; Aug. 20, 1982, p 8; *Newsweek,* Feb. 14, 1983, p 76; *Newsweek,* March 21, 1983, p 52; Debate on Boundaries of Life, *Time,* April 11, 1983, pp 68-69).

6. Parenthetically, Kansas has adopted a statutory definition of brain death.

was, in fact, dead before the life support system was disconnected, then, what the physicians did after that point is totally irrelevant (see, e.g., O'Hara, Medical-Legal Agreement on Brain Death: An Assessment of the Uniform Determination of Death Act, 8 J of Contemp L 97, 120-121).

Adoption of the formulation set forth by Justices RUBIN and NIEHOFF also leads to a maze of contradictions. Under their theory, defendant's criminal liability hinges upon whether the individual "pulling the plug" too soon is a physician or a member of the decedent's family. If the latter, the defendant would be relieved of criminal responsibility, no matter how laudable the motive and no matter how terminal the patient; if a physician, defendant would remain responsible irrespective of how erroneous his diagnosis of the prospects of death may be. Responsible jurisprudence cannot accept such logic.

In sum, I am not willing to strain settled principles of causation solely to sustain a conviction of homicide, as opposed to assault, simply because the defendant intended to commit a brutal crime. "The doctrine that a person whose conduct excites moral disapproval may be punished for doing what he has not done is * * * a dangerous one" (Hart & Honor, op. cit., p 294).[7]

---

**7.** As Justices RUBIN and NIEHOFF point out, causation is not legislatively defined in this State. Perhaps this is because the question of causation is really one of fact and degree for which mechanical rules cannot be laid down; the general guides are "not tests, but clues" (Perkins, Criminal Law [2d ed], p 694, quoting CARDOZO, The Paradoxes of Legal Science). No statute can be drafted which would encompass the myriad factual permutations (see, e.g., Hart & Honor, Causation in the Law, p 357, criticizing the formulation contained in section 2.03 of the Model Penal Code, as not providing specifically for those "cases where causal problems arise because, although the accused did not intend it, another human action besides [the] accused's is involved in the production of the proscribed harm. These are treated merely as one kind of case where harm may or may not be 'too accidental' in its manner of occurrence"). The California Joint Legislative Committee for the Revision of the Penal Code proposed a two-step formulation for intentional crimes in "but for" circumstances; causation would be established if the intended result in fact occurred and "(i) is within the purpose or contemplation of the defendant, whether the purpose or contemplation extends to natural events or to the conduct of another, or, if not, (ii) involves the same kind of injury or harm as that designed or contemplated and is not too remote, accidental in its occurrence or dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of the offense" (Penal Code Revision [Tent Draft No. 32], § 408, quoted in Kadish & Paulsen, Criminal Law [3d ed], p 325). The proposal was never enacted.

## IV

From a review of the record, I am convinced that the People failed to establish defendant's guilt of manslaughter in the first degree beyond a reasonable doubt. There is simply no evidence that, under any standard, the victim "died" before the organ transplant operation was performed. To further highlight the prosecution's failure to carry its burden on the question of death and its causes, it should be emphasized that the record contains no affirmative evidence that the victim's respiration and circulation terminated at any point after the transplant operation was complete and the respirator was stopped, except that which can be deduced from the fact that the victim was dead in the common-law sense at the time that the autopsy was conducted by the medical examiner. On the proof adduced at trial it is entirely possible that the victim suffocated in the body bag on the way to the medical examiner's office.

The reason for these deficiencies in proof is that the People relied exclusively on brain death, a standard we have determined is not appropriate for judicial adoption. The People were forced into this strategic position because the hospital record and the testimony of the medical experts would not support a finding of common-law death prior to the transplant operation and the People tried to avoid the causation problem generated by the transplant operation by fixing the death of the brain prior to the operation. The People's failure to adduce proof of common-law death after the operation is consistent with their reliance on brain death and is tantamount to an admission that the transplant operation was an independent intervening cause which relieved the defendant of criminal responsibility for the death of the victim. Accordingly, on appeal, the People cannot overcome this failure of proof by belatedly urging this court to focus on the ultimate fact of death.

The testimony of all of the medical experts, indicating that the victim would have probably died from the bullet wound to the head, merely demonstrates that the defendant inflicted a mortal wound. It does not establish that the defendant's conduct caused the death. Indeed, according to the medical examiner, if the victim was not brain

dead at the time of the operation, the operation would have killed him. There is a scanty medical record. The doctor who made the brain death determination did not refute the experts' testimony concerning the necessity of certain procedural tests which were absent here. Moreover, he did not testify as to the results of certain tests or that certain tests were performed twice. The electroencephalograms, which are meant to be confirmatory evidence, did not confirm the brain death determination. Finally, there was no testimony that this physician was qualified to modify the elements of established protocols.

With respect to the medical examiner's testimony, there are also difficulties because in his answers he never distinguished common-law death from brain death. Further, while he did not rely on the hospital's determination of brain death to reach his opinion that the bullet wound caused death, his own finding of brain death was a necessary factor in his conclusions as to the cause of death. As noted above, he testified that if the victim was not brain dead at the time of the operation, the operation would have killed him and that he could not fix the time of brain death.

While it is the sole province of the jury to resolve issues of credibility (*People v Gruttola,* 43 NY2d 116, 122; *People v Joyiens,* 39 NY2d 197, 203), we are required to review the entire record to determine whether the evidence is sufficient in quality and quantity to justify a finding of guilt beyond a reasonable doubt (*People v Reed,* 40 NY2d 204, 208; *People v Santos,* 38 NY2d 173, 175-176). When, as here, the proof of a key element of the crime itself consists of no more than mere surmise and speculation, we are obliged to set the conviction aside (*People v Montanez,* 41 NY2d 53; *People v Reed, supra; People v Williams,* 35 NY2d 783).

This, however, does not require dismissal of the indictment. While due to the lack of proof of the causation element, the record does not establish the defendant's guilt of manslaughter in the first degree, i.e., that with intent to cause serious physical injury to another person, he caused the death of such person (Penal Law, § 125.20, subd 1), all of the other elements have been proven beyond a reasonable doubt. This would support a conviction of assault in

the second degree (Penal Law, § 120.05, subd 1). Accordingly, the appropriate corrective action would be to reduce the conviction to that charge (CPL 470.15, subd 2, par [a]) and remit for resentencing (CPL 470.20, subd 4; see *People v Graham,* 36 NY2d 633).[8]

## V

Putting to one side the questions of whether a common-law or brain death standard is appropriate and whether there was, in the abstract, sufficient evidence adduced in support of either, it is evident that the trial court's refusal to define death constituted serious error.

A properly instructed jury could have found causation lacking because the physicians, in their zeal to obtain the victim's organs, shortened their patient's life but a matter of hours (see Hart & Honor, *op. cit.,* pp 308-309 [discussing an English case to that effect]; *People v Mitchell,* 132 Cal App 3d 389, 396-397, *supra* [finding causation where physicians merely disconnected the life support systems and indicating that a different result might have obtained had the deceased's organs been removed for transplant purposes]; Runk, Brain Death: The Emerging Common Law Definition in Criminal Homicide, 6 Western State U L Rev 295, 305). In other words, the jury could have found that the infliction of the wound was the *opportunity for,* rather than the *cause of,* the organ harvesting operation.

Without a definition of death, the time that death occurred cannot be determined and the time of death affects causation (see *State v Williams,* 247 Ga 200 [indictment that did not set forth time and date of death was jurisdictionally defective]). This question was taken from the jury here by the trial court's refusal to supply it with a standard for ascertaining the point at which death had occurred (cf. *State v Meints,* 212 Neb 410 [jury instruction patterned after generally accepted medical criteria of death]). The choice of a proper definition is a legal question and cannot be left solely to the jury's discretion.

---

8. Assault in the second degree is the only applicable lesser-included offense. Assault in the first degree contains elements additional to those specified for manslaughter in the first degree (cf. *People v Glover,* 57 NY2d 61) and defendant's acquittal of murder, under the facts of this case, must be deemed to constitute an implicit acquittal of attempted murder as well (*People v Ressler,* 17 NY2d 174, 179).

It is axiomatic that a guilty verdict can never be directed and thus a court has no power to instruct the jury that any fact essential to conviction has been established as a matter of law "[n]o matter how conclusive the evidence was" (*People v Walker,* 198 NY 329, 334; see, also, *People v Weiss,* 290 NY 160, 171). Yet, no matter how disguised, that is the prop that supports the thesis adopted by a majority of this court. I cannot cast my vote to support it for "even the criminal most deserving of punishment is entitled, under our system, to a fair and impartial trial" (*People v Herman,* 255 App Div 314, 315; see, also, *People v Donovan,* 13 NY2d 148, 154; *People v Bai,* 7 NY2d 152, 155).

## VI

For the reasons I have stated, I would modify the conviction of manslaughter in the first degree to one of assault in the second degree and remit for resentencing. Alternatively, I would remit for a new trial.[9]

LAZER, J. (dissenting). I agree with Justice TITONE's analysis of the reasons why the error in failing to define death to the jury has been preserved. I disagree with his conclusion that the manslaughter conviction should be reduced to assault in the second degree. There was ample proof that the defendant was responsible for the victim's common-law death. Therefore, I would reverse and remit for a new trial.

From its beginning almost to the end, the case was tried on the People's theory that defendant's gunshot had inflicted brain death. At the onset, the People requested that a definition of death other than respiratory and heart function death be given, the defendant agreed and the court declared that it intended to instruct the jury that death is the irreversible cessation of all functions of the brain because, without such a charge, the jury would be in

---

**9.** After this opinion was released, the California Court of Appeal, Second Appellate District, granted a writ of prohibition against the prosecution of the doctors in the case referred to in footnote 5 above, thereby reversing a Superior Court Judge who had, essentially, overruled a magistrate's determination and directed the reinstatement of a murder information (*Barber v Superior Ct.,* 147 Cal App 3d 1006). That court, in the course of its opinion, observed that a murder prosecution was a "poor way" to resolve the complex legal, medical and moral issues involved and urged prompt legislative action. I am, of course, in total agreement.

a turmoil and "would not have sufficient knowledge as laymen * * * to decide what is death". The opening statements centered on brain death, the People contending that the defendant's shot placed the victim in a state of brain death while the defendant argued that the current medical standards for establishing brain death had not been met when the organ transplants were commenced.

The chief disagreement between the expert witnesses was whether the victim was brain dead when his organs were removed and whether the proper tests had been performed to establish brain death. Nevertheless, the expert testimony provided a sufficient basis for the jury to find that the victim's wound was mortal and that common-law death — cessation of heart beat and respiration — was inevitable within a brief time. Viewing the record of this trial which focused on brain death and concluded without death being defined to the jury, I remain unassured that the jury knew whether it was brain death or common-law death that was in issue. The distinction is important for more than semantic reasons because the court instructed the jury that it would be a defense to the homicide charge if the "secondary agency" — the organ transplants — were the sole cause of death. But if the jury believed that brain death was at issue, it could have found the defendant guilty of manslaughter without ever reaching the question of secondary agency. Since I am far from certain that the jury comprehended the undefined distinctions between brain death and common-law death, I conclude that the failure to define death requires reversal. How the charge error was preserved is cogently revealed in Justice TITONE's opinion. The defendant certainly made it apparent that a definition of death was necessary and expressed the willingness to accept a charge that death occurs when the cardiac and respiratory functions cease.

Where I part company with Justice TITONE is in his conclusion that the organ transplants relieved the defendant of homicidal responsibility. Since my position in this respect essentially comports with that of the majority, I will abjure a further recitation of the applicable authorities so ably reviewed in Justice RUBIN's opinion. Whether there can be any legal consequences to the persons who

took part in the transplant operation upon the instant victim, who had suffered an apparently mortal wound with common-law death imminent (see Public Health Law, art 43), is not relevant; the transplants did not relieve the original homicidal actor of criminal responsibility for the victim's common-law death. If an act of malpractice by a physician treating a mortally injured victim will not relieve a criminal defendant of responsibility for the death (see *People v Kane,* 213 NY 260; cf. *People v Stewart,* 40 NY2d 692), I do not see why in this day and age a defendant who has inflicted imminent death upon another should be relieved of homicidal responsibility if the person *in extremis* becomes the subject of a transplant procedure. Reverting to traditional analysis, the defendant's act clearly contributed to the victim's death even though other acts may have aided in the result (see *People v Cicchetti,* 44 NY2d 803) and on this record it cannot be said that death was solely attributable to the secondary agency (see *People v Stewart, supra; People v Kane, supra*). It is sufficient that "the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused" (see *People v Kibbe,* 35 NY2d 407, 412, citing 1 Wharton, Criminal Law Procedure, § 169). If foreseeability is a criterion, it is foreseeable that a person whose imminent death is inevitable may be the subject of organ transplants intended to rescue the lives of others. Commission of a homicidal act does not endow the actor with an immunity from visualizing a consequence that is apparent to the rest of society.

Accordingly, my vote is for reversal and a new trial.

NIEHOFF, J., concurs with RUBIN, J., in a separate opinion; GULOTTA, J., concurs in the opinion of NIEHOFF, J.; TITONE, J. P., dissents insofar as he votes to reduce the conviction of manslaughter in the first degree to assault in the second degree and otherwise concurs to affirm the judgment, with an opinion; LAZER, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Kings County, rendered April 28, 1980, affirmed.